*Joan Floyd v. Baltimore City Council, et al.*, No. 1687, September Term, 2017.  Opinion by Kenney, J.

## LEGISLATIVE PRIVILEGE – MOTION TO QUASH SUBPOENAS

The trial court did not abuse its discretion in granting a motion to quash subpoenas for two Baltimore City Council members based on legislative privilege.  Appellant sought to ask questions related to why certain actions were taken by Council members in regard to the passage of legislation.  Such actions are within the sphere of legitimate legislative activity and are protected by legislative privilege, but appellant was able to pursue questions related to compliance with the Open Meetings Act with a legislative staff member.

## ONLINE VIDEO RECORDINGS NOT IN EVIDENCE

In a bench trial, the court may not rely on facts that are not in the record.  The litigant has the burden to introduce evidence into the record for the court's consideration in a manner that it could be preserved for the possibility of appeal.  It was not an error for the court, when asked to do so, to decline to go onto an external website to view video recordings.

## OPEN MEETINGS ACT – MINUTES REQUIREMENT

Minutes reflecting that the Land Use Committee recommended Bill 12-0152 "favorable with amendments" satisfied the requirements, under Md. Code Ann., General Provisions § 3-306(c), that the minutes reflect each "item" considered, each "action" taken, and each "vote" that was recorded.  The City Council Rules require that a Committee report to the Council on bills on which it has taken action, and that the report must be either favorable, favorable with amendments, unfavorable, or without recommendation.  The report on the bill was the "item" under consideration in the Committee meeting, and the minutes reflect the Committee's action on that bill.

## OPEN MEETINGS ACT – NOTICE AND MINUTES REQUIREMENT – LUNCHEON

With regard to the Council's luncheon, the purported notice did not comply with § 3-302(b) of the Act because it did not state the time or place of the luncheon.  And, it is undisputed that no minutes were kept or posted for it.

## OPEN MEETINGS ACT – WILLFUL VIOLATION – OTHER RELIEF

The violations of the Act related to the luncheon did not rise to the level of a willful violation that would permit voiding the legislation.  The circuit court did not clearly err in finding that the only evidence presented at trial showed that Council members did not

discuss Bill 12-0152 at the luncheon.  Because the circuit court may assess reasonable counsel fees and other litigation expenses in an Act enforcement claim, remand to the circuit court is appropriate to determine whether such fees and expenses should be awarded and, if so, the amount of any award.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1687

September Term, 2017
_____

JOAN FLOYD

v.

BALTIMORE CITY COUNCIL, ET AL.
_____

Fader, C.J.,
Friedman,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Kenney, J.
_____

Filed:  June 4, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In December 2016, Baltimore City enacted legislation known as "Transform Baltimore," which was its first comprehensive rezoning plan since 1971. Appellant, Joan Floyd, has challenged the legislation under the Open Meetings Act, Md. Code Ann. (2014, 2018 Supp.), General Provisions ("GP") §§ 3-301 *et seq.* (the "Act"), alleging that the Baltimore City Council (the "Council") and the Land Use and Transportation Committee (the "Committee")[1], had violated the Act with respect to several meetings conducted near the time of the bill's passage. The Circuit Court for Baltimore City, finding no actionable violations of the Act, entered judgment in favor of the appellees.

In her timely appeal, appellant presents five questions[2], which we have consolidated and reordered as:

---

[1] Appellant's petition named "Baltimore City Council" and "Land Use and Transportation Committee" as respondents. The circuit court noted that only the Mayor and City Council entered an appearance and "the parties proceeded as if the case was filed only against the Mayor and City Council." We will refer to the Council and the Committee collectively as the "City" in this opinion.

[2] Appellant asked the following questions:

1. When the evidence established that dozens of votes were excluded from the "minutes" of the Committee's October 20, 2016 meeting, did the trial court err in determining that Open Meetings Act 3-306(c) was not violated?
2. When the evidence established that a City Council luncheon meeting took place on October 24, 2016 for which no reasonable advance notice of the date, time and place was provided, did the trial court err in determining that Open Meetings Act 3-302 was not violated?
3. Did the trial court err in determining that Open Meetings Act 3-306 was not violated as to minutes of the October 24, 2016 luncheon meeting?
4. Did the trial court err when it granted the [City's Motion to Quash Subpoenas] and barred [appellant] from compelling the testimony of the President of the City Council and the Chairman of the Committee?

1. Did the trial court err in granting the City's Motion to Quash Subpoenas based on legislative privilege?

2. Did the trial court err in not considering online audio-visual recordings of certain Committee and Council meetings?

3. Did the trial court err in determining that there was no violation of the minutes requirement of the Act in the Committee's October 20, 2016 meeting?

4. Did the trial court err in determining that there was no violation of the notice or minutes requirements of the Act in the Council luncheon meeting on October 24, 2016?

For reasons that follow, we answer the first three questions in the negative and the fourth in the affirmative.

## FACTUAL AND PROCEDURAL BACKGROUND

Bill 12-0152, the legislation known as "Transform Baltimore," was introduced in the Baltimore City Council on October 22, 2012, and assigned to the Land Use and Transportation Committee. Over the next four years, the Committee conducted over 80 public hearings and considered hundreds of amendments to its text and zoning map in open session. On October 19 and 20, 2016, the Committee met in open session, and, on October 20, voted to recommend Bill 12-0152 "favorable with amendments." The online-posted minutes of that meeting reflected the following:

> A motion was made by Councilmember Kraft, seconded by Councilmember Middleton, that Bill 12-0152 be recommended Favorable with Amendments. The motion for carried by the following vote:

(…continued)
5. Did the trial court err when it refused to view to official online audio-visual recordings of the October 19, 2018 Committee meeting and the October 20, 2016 and October 24, 2016 5:00pm City Council meetings?

2

Yes: 6 – Reisinger, Kraft, Branch, Clarke, Henry, and Middleton
Absent: 1 – Mosby

On the evening of October 24, 2016, the full Council convened in open session to consider Bill 12-0152.[3] Some proposed amendments were adopted by the Council; some were not. Ultimately, the Council voted favorably on Bill 12-0152 with amendments. The official minutes reflecting the Council's votes on amendments and the final vote were recorded in the Council's Journal and posted online on the Council's Legistar website.

Earlier on October 24, there was a "luncheon meeting" of the Council hosted by Mayor Stephanie Rawlings-Blake in the Mayor's executive conference room. No minutes of that "luncheon meeting" were recorded.

On December 2, 2016, appellant, along with others, filed a "Petition for Enforcement of the Open Meetings Act" against the Council and Committee. The petition alleged that the Council and Committee violated the Act's provisions with respect to the Committee meetings of October 19 and 20, 2016 and the Council's luncheon meeting of October 24, 2016.

---

[3] The Council's legislative procedure is a three part process: first reading, second reading, and third reading. On first reading, after a bill is introduced by a Council member, it is assigned to a Committee. The Committee receives agency reports, holds public hearings, and does "much of the work of the Council." On second reading, the Committee reports the bill at a Council meeting with its recommendation. If the Council passes the bill on second reading, the Department of Legislative Reference prepares and prints it for third reading, which is when the Council takes final action on the legislation. *See* Baltimore City Charter, Art. III, § 14(c); City Council Rule 12-1 *et seq.*; Baltimore City Council, http://www.baltimorecitycouncil.com/legislative-process.

The Council passed Bill 12-0152 on December 5, 2016, and the Mayor signed it into law that same night.[4] The new zoning code and accompanying zoning map took effect on June 5, 2017.

The circuit court denied the City's motion to dismiss on February 22, 2017, and trial was set for June 9, 2017. On June 2, 2017, appellant served the City with subpoenas to compel testimony of Council President Bernard C. "Jack" Young, Council member and Committee Chairman Edward Reisinger, and the Director of Legislative Affairs for the Council President, Kara Kunst. The City moved to quash the subpoenas for the Council members on the grounds of legislative privilege, and it moved in limine to limit the testimony of Ms. Kunst to only those matters related to the Council's compliance with the requirements of the Act. The circuit court, finding that "legislative privilege applies," granted both motions.

At trial, appellant and Ms. Kunst both testified. When the proceedings closed, the court stated that it had "some reviewing to do" and would issue a written ruling. On June 30, 2017, the court entered judgment in favor of the City. It found that appellant had "failed to produce any evidence to support the[] claim that [the City] committed any actionable violation of the Open Meetings Act," and that "[w]hile the process was not

---

[4] Appellant points out that a new Mayor was about to be sworn in on December 6, 2016 and a new Council two days after that. To pass Bill 12-0152 by the end of that legislative session, it was necessary that the second reading vote occur on October 24, 2016. It is appellant's position that the rush to the pass the bill prior to the change in administration resulted in willful violations of the Act.

perfect . . . there is no indication that the errors were the result of anything more than human error . . . [that] does not give rise to a cause of action."

## STANDARD OF REVIEW

When a cause of action is based on a violation of the Open Meetings Act, there is a statutory presumption that the public body did not violate the Act, and the complainant has the burden of proving the violation. *See* GP § 3-401(c).[5]

> In our review of an action tried without a jury, we:
>
> must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed. Questions of law, however, require our non-deferential review. When the trial court's decision involves an interpretation and application of Maryland statutory and case law, [we] must determine whether the lower court's conclusions are legally correct. Where a case involves both issues of fact and questions of law, [we] will apply the appropriate standard to each issue.

*Clickner v. Magothy River Ass'n Inc.*, 424 Md. 253, 266-67 (2012) (cleaned up); Md. Rule 8-131(c).

We review the trial court's ruling on a motion to quash subpoenas under an abuse of discretion standard. *See Doe v. Maryland Bd. of Social Workers*, 154 Md. App. 520, 527-28 (2004); *WBAL-TV Div., Hearst Corp. v. State*, 300 Md. 233, 247 (1984) (holding no abuse of discretion in denial of TV station's motion, based on a qualified First Amendment privilege, to quash summons by the State to produce the unbroadcast

---

[5] In an action under this section:
(1) it is presumed that the public body did not violate any provision of this title; and
(2) the complainant has the burden of proving the violation.

5

portions of a videotaped interview with criminal defendant for possible use at trial).

Generally, an abuse of discretion occurs "where no reasonable person would take the view adopted by the [trial] court." *Metheny v. State*, 359 Md. 576, 604 (2000) (internal quotations omitted). When, however, the ruling "involves an interpretation and application of Maryland statutory and case law, we must determine whether the trial court's conclusions are legally correct under a de novo standard of review." *Johnson v. Francis*, 239 Md. App. 530, 542 (2018) (internal quotations omitted).

## DISCUSSION

### I.

### Legislative Privilege

As indicated, the City moved to quash the subpoenas for the two Council members based on legislative privilege and moved in limine to limit the testimony of Ms. Kunst to administrative details. The trial court, finding that "legislative privilege applies," granted the motions.

*Contentions*

Because the Act expressly authorizes a court to determine whether a public body's violation of the Act was willful, appellant contends that direct examination of the members of a public body is required. And, for that reason, "legislative privilege" has no place in an Open Meetings case, because it would allow "[a]ny public body composed of legislators . . . [to] effectively violate the Act with impunity." It is her position that legislative privilege is "anathema to enforcement of the Act."

6

More specifically, she argues that Council President Young and Committee Chairman Reisinger were "uniquely positioned and qualified to elucidate the proceedings of these two public bodies" over which they presided. By restricting her ability to elicit testimony from the Council members, the trial court prevented her from obtaining information from competent witnesses, which severely prejudiced her efforts to succeed on her claim.

Citing *Community and Labor United For Baltimore Charter Committee v. Baltimore City Bd. of Elections*, 377 Md. 183 (2003) (which we will refer to as "*CLUB*" in this opinion), she contends that both Mr. Young and Mr. Reisinger had been Council members during the period of 2002-03 when the facts underlying that case occurred and would have particular insight into how, or if, the Council had taken any post-*CLUB* steps to reform their procedures and to comply with the Act. In addition, their involvement, in what she characterizes as a prior willful violation of the Act in *CLUB*, would be circumstantial evidence of a willful violation in this case.

She further argues that she needed the testimony of Mr. Young and Mr. Reisinger because Ms. Kunst, a staff member, was not competent to testify on matters relating to the Act. Even if she was qualified to "support and possibly to implement the policy of the [Council] and [Committee] regarding the [Act]," she was not qualified "to make or explain that policy." Nor was she competent to testify "as to what [Council] and Committee members themselves discussed, and with whom, during the 'recess' between the evening meetings of October 20 and 24, 2016."

7

The City responds that the court correctly quashed the subpoenas based on the well-developed doctrine of legislative privilege, which protected Mr. Young and Mr. Reisinger from having to testify about actions taken within the sphere of legitimate legislative activity. It asserts that Maryland law does not recognize an Open Meetings Act exception to legislative privilege, and that the *CLUB* Court did not discuss legislative privilege at all.

*Analysis*

Judge Wilner, writing as the Chief Judge of this Court, has expounded on the doctrine of legislative privilege:

> Members of Congress and members of the Maryland General Assembly have a separate Constitutional immunity from being called upon, in any official non-legislative forum, to defend their conduct in legislative proceedings. Article I, § 6 of the U.S. Constitution provides that "for any Speech or Debate in either House [Senators and Representatives] shall not be questioned in any other Place." A similar provision, applicable to members of the General Assembly, has appeared in the Maryland Constitution since 1776. Article 10 of the current Maryland Declaration of Rights states that "freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature." Article III, § 18 of the State Constitution adds that "[n]o Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."
>
> These Constitutional clauses trace their immediate history to the English Bill of Rights of 1689, although there is evidence of a much earlier origin. *See* discussion in *Holmes v. Farmer*, 475 A.2d 976, 981 (R.I. 1984). They have long been regarded as "an important protection of the independence and integrity of the legislature" and, in this country, as also reinforcing the core doctrine of separation of powers. *United States v. Johnson*, 383 U.S. 169, 178, 86 S. Ct. 749, 754 (1966); also *Blondes v. State*, 16 Md. App. 165 (1972). The State privilege [arises from the same sources as] the Federal (*Blondes*, 16 Md. App. at 175), and thus both are to be "read broadly to effectuate [their] purposes" (*Johnson*, 383 U.S. at 180) and to protect not only words spoken in debate "but anything 'generally done in a session of

8

the House by one of its members in relation to the business before it.' " *Johnson* at 179, quoting from *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881).

*Montgomery County v. Schooley*, 97 Md. App. 107, 113-14 (1993) (cleaned up).

While federal and state constitutional immunity provisions expressly refer to the Congress and the General Assembly, respectively, the doctrine of legislative privilege extends to local and municipal legislators as a matter of common law. *See Manders v. Brown*, 101 Md. App. 191, 205 (1994) ("federal and local privileges are essentially co-extensive"); *Schooley*, 97 Md. App. at 114-15 (explaining the common law doctrine of official immunity and that it is applicable to "members of local and regional legislative bodies as well as to State legislatures"); *see also State v. Holton*, 193 Md. App. 322, 362-64 (2010) (recognizing a statutory source for legislative immunity for local legislators under § 5-501 of the Courts and Judicial Proceedings Article), *aff'd*, 420 Md. 530 (2011).

Federal courts have interpreted the privilege to cover not just "speech or debate," but also "matters . . . integral [to] the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," which includes a legislator's "conduct at legislative committee hearings." *Gravel v. United States*, 408 U.S. 606, 624-25 (1972). But, the privilege does not extend beyond "the sphere of legitimate legislative activity," *see Schooley*, 97 Md. App. at 115, and "only when

9

necessary to prevent indirect impairment of such deliberations, has it been extended beyond pure speech and debate in the legislative body." *Gravel*, 408 U.S. at 625.[6]

---

[6]      *Gravel* involved a federal criminal investigation arising from the release and publication of classified Defense Department documents, known as the "Pentagon Papers." One area of inquiry was a Senate subcommittee meeting chaired by U.S. Senator Mike Gravel of Alaska, at which the classified documents were read and placed in the public record. Among the witnesses subpoenaed was a staff aide to Senator Gravel. Senator Gravel moved to quash the subpoena citing privilege under the Speech or Debate Clause.

The U.S. District Court denied the motion to quash, but limited the questioning of the aide based on legislative privilege. The U.S. Court of Appeals for the First Circuit affirmed the denial of the motion to quash, but modified the protective order. It agreed that the Speech or Debate Clause barred inquiry of the Senator and his aide with respect to legislative acts, but added that neither could be questioned with respect to the private publication of materials introduced into the subcommittee record based on "a common-law privilege akin to the judicially created immunity of executive officers from liability for libel contained in a news release issued in the course of their normal duties." 408 U.S. at 612.

The Supreme Court held: that the Speech or Debate Clause privilege applies both to the Senator and his aide; and that privilege would forbid "questioning any witness . . . (1) concerning the Senator's conduct, or the conduct of his aides, at the . . . meeting of the subcommittee; (2) concerning the motives and purposes behind the Senator's conduct, or that of his aides, at that meeting; (3) concerning communications between the Senator and his aides during the term of their employment and related to said meeting or any other legislative act of the Senator; (4) except as it proves relevant to investigating possible third-party crime, concerning any act, in itself not criminal, performed by the Senator, or by his aides in the course of their employment, in preparation for the subcommittee hearing." *Id.* at 628-29.

The Court explained, "[P]rivate publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence." *Id.* at 625. And, "[i]f republication of these classified papers would be a crime under an Act of Congress, it would not be entitled to immunity under the Speech or Debate Clause." *Id.* at 626.

Maryland courts have adopted similar rules for state and local legislative immunity. *See Blondes v. State*, 16 Md. App. 165, 178-79 (1972); *Schooley*, 97 Md. App. at 114-17.

The purpose of legislative privilege is to protect the "legislative function" and to permit it to "be performed independently without fear of outside interference." *Schooley*, 97 Md. App. at 116 (quoting *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 731-32 (1980) ("To preserve legislative independence, we have concluded that legislators engaged in the sphere of legitimate legislative activity . . . should be protected not only from the consequences of litigation's results but also from the burden of defending themselves."); *see also United States v. Mandel*, 415 F. Supp. 1025, 1030-31 (D. Md. 1976) (holding that legislative privilege could not be invoked to stop inquiry into a governor's approving or vetoing bills and recommending legislative matters to the General Assembly because that "does not interfere with the due functioning of the legislative process" or "threaten the independence of the legislature.").

Legislative privilege may be invoked to protect a legislator from being "required to testify regarding . . . actions" taken within the sphere of legitimate legislative activity. *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992). It extends as well to legislative staff members, officers, or other employees of the legislative body, but, as to them, it is "less absolute" than to the "legislators themselves." *See Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967).

In regard to the subpoenas in this case, the circuit court allowed appellant's counsel to proffer questions and the specific areas of inquiry that he intended to pursue with the two Council members. A summary of that proffer is provided in an appendix to this opinion. Many of the questions were directed to certain amendments to the legislation, and why certain actions were taken in regard to its passage. Such questions

11

involve "the deliberative and communicative processes . . . with respect to the consideration and passage or rejection" of the legislation at issue. *Gravel*, 408 U.S. at 625. As to the questions about the luncheon, appellant was able to pursue some of them with Ms. Kunst, whom the court found competent to answer as the Director of Legislative Affairs. In short, we perceive neither error nor abuse of discretion by the court in quashing the subpoenas for the two Council members and limiting Ms. Kunst's testimony to administrative details and matters related to the Council's and Committee's compliance with the Act and its requirements.

As noted, appellant contends that the application of legislative privilege to her subpoena requests strips the Act of all force and purpose, and therefore it should not be applied in cases based on a violation of the Act.[7] We are not persuaded because questions specifically related to compliance with the Act would not be protected by legislative privilege and appellant was able to pursue these questions with Ms. Kunst.

---

[7] In *Avara v. Baltimore News Am. Div.*, 292 Md. 543 (1982), which was a declaratory judgment action that involved the exclusion of the press and the public from a Conference Committee meeting on a budget bill, the Court of Appeals declined to reach the State's argument that Maryland's constitutional Speech and Debate Clauses prevented application of the Open Meetings Act to state legislators. It explained:

> Courts consistently adhere to a policy of not deciding constitutional issues unnecessarily. *See Simms v. State*, 288 Md. 712, 725 (1980). Consequently, in view of our disposition of this case, we do not consider the Attorney General's argument that the Speech and Debate Clauses of the Maryland Constitution and Declaration of Rights render the provisions of the Act inapplicable to members of the Legislature.

*Id.* at 554 n.7. The Court, although it agreed that the Act was applicable, held that the declaratory judgment remedy was not available in the case.

12

But, even if we perceived a tension between the doctrine of legislative privilege and the requirements of the Act, a judicial carve-out of an exception to the application of that doctrine in such cases would be inappropriate. That, in our view, would be a policy issue to be addressed by the General Assembly and not by the courts. *See Kleitman v. Superior Court*, 87 Cal. Rptr. 2d 813, 821-22 (Cal. Ct. App. 1999).[8]

---

[8] In *Kleitman*, the complaining resident contended that an unrecorded closed session violated the Brown Act, a California state law, providing for, among other things, open meetings and disclosure of tape recordings of closed sessions under specific circumstances. The resident moved to compel interrogatory answers, and the trial court issued an order essentially requiring disclosure of the council members' personal recollections of the closed session.

On appeal, the Court of Appeal, Sixth District, held that the trial court could not compel disclosure of personal recollections of city council members with respect to a closed session:

> [P]rocedural safeguards seem particularly appropriate when the discovery sought concerns *matters which may impinge on the legislative privilege*. As this court has previously held, discovery into the subjective motives or mental processes of city council members is prohibited. (*City of Santa Cruz v. Superior Court*, [48 Cal. Rptr. 2d 216 (Cal. Ct. App. 1995)]) Finally, we believe that [the resident's] contention that interested persons must be able to compel the members of legislative bodies to disclose their recollections of unrecorded closed sessions whenever a Brown Act violation is alleged, *is one which should be addressed to the Legislature, rather than the courts*.

(Emphasis added).

13

## Online Audio-Visual Recordings

*Contentions*

Appellant asserts that her petition for enforcement of the Act provided the trial court with "the location on the City's own Charm TV website—including time stamps—of relevant portions of the official audio-visual recordings of the Committee meeting of October 19, 2016 and the Council's 5:00 p.m. meetings of October 26, 2016 and October 24, 2016." She provided the time stamped segments to show that what was discussed at the meetings did not match the meeting agendas, that portions of the recordings were inaudible, and that during those meetings members "spoke among themselves and consulted with staff away from the microphones." She contends that the recordings were a "unique form of the evidence—official, archived audio-visual recordings on the City's own website, which the Act expressly recognizes as constituting official minutes," and therefore should have been viewed by the court before making its decision.[9]

The City responds that appellant never produced or introduced the recordings as evidence at trial, and therefore, it would have been inappropriate for the trier of fact to consider evidence that was not part of the record.

*Analysis*

When appellant brought up the online recordings at trial, appellant's counsel asked her what "specific footage" she was asking the trial court to see. When appellant

---

[9] To the extent that appellant is suggesting that the trial court should have taken judicial notice of the contents of the videos, the court was never asked to do so.

responded that she could show the footage on her iPhone or tell the court the time stamps that she "liked for the court to see," the following exchange took place:

[Appellant's counsel:] Your Honor, at the present time, I'm not sure how you would wish us to proceed.

[The Court:] I'm not trying this case.

[Appellant's counsel:] Okay. All right.

[The Court:] I don't know what you're asking me.

[Appellant's counsel:] Well, the question is, is it possible that we could bring this up? I'd asked the Clerk before the hearing started whether it could be brought up in the courtroom because it's online from the City. And I don't . . . have an answer. . . .

[The Court:] Did you contact the administrative office and figure out what the procedure is to make that happen?

[Appellant's counsel:] No, I did not, Your Honor.

[Appellant:] I have an iPhone.

[Appellant's counsel:] I'm not sure that iPhone's doing –

[The Court:] Problem is preservation of evidence.

At that point, appellant's counsel stated to appellant, "I know you would prefer to show it, but at this point, we may or may not be able to show it." Counsel then proceeded to ask appellant to explain what she had observed in her viewing of the recordings, which she did.

In its June 30, 2017 opinion, the trial court explained:

This court did not go into any external website as suggested by [appellant] to view the meetings that were available on Charm TV as . . . [appellant]

15

had an obligation to produce, in court, any evidence [appellant] wished for the court to review and consider.

"In a bench trial, the court may not rely on facts that are not in the record." *Massey v. State*, 173 Md. App. 94, 125 (2007). Simply put, appellant had the burden to introduce evidence into the record for the court's consideration in a manner that it could be preserved for the possibility of appeal. That was not done, and therefore we perceive no error.

## III.

### The Committee's October 20, 2016 Meeting

*Contentions*

With regard to the Committee's meeting of October 20, 2016, appellant contends that the Act was violated because the minutes "failed to reflect all but one of the votes taken at the meeting." She argues that, although the Committee considered "hundreds of amendments" and "took over forty roll call votes and three voice votes" at that meeting, the official minutes reflected only one vote:

> A motion was made by Councilmember Kraft, seconded by Councilmember Middleton, that Bill 12-0152 be recommended Favorable with Amendments. The motion for carried by the following vote:
>
> Yes: 6 – Reisinger, Kraft, Branch, Clarke, Henry, and Middleton
> Absent: 1 – Mosby

And, because no audio-visual recording of the meeting was made available online[10], she argues that adequate minutes were "critical" for the public to "learn what transpired at the one and only voting session the Committee ever held on a proposed new comprehensive zoning map for the entire City of Baltimore."

The City contends that the minutes comply with the Act.

*Analysis*

The trial court found:

While the minutes may not have lived up to [appellant's] expectations, [she] presented no evidence to support any contention that the minutes either were not provided or that the minutes were insufficient. Instead, Ms. Kunst . . . testified that with respect to the contents of the City Council's Journal, she looks to the Open Meetings Act, the City Council's Rules, the Maryland General Assembly and neighboring jurisdictions for guidance on what to include in the minutes. . . . The minutes provided in this case meet the statutory requirements.

[Appellant] did not present through either [her] testimony, through any witness or through any expert testimony evidence to support [her] contention that the [City] failed to provide minutes[.]

GP § 3-306 of the Act provides:

(b)(1) Subject to paragraphs (2) and (3) of this subsection, as soon as practicable after a public body meets, it shall have minutes of its session prepared.
(2) A public body need not prepare minutes of an open session if:
    (i) live and archived video or audio streaming of the open session is available; or
    (ii) the public body votes on legislation and the individual votes taken by each member of the public body who participates in the voting are posted promptly on the Internet.

---

[10] An online-posted video or audio recording would have satisfied the minutes requirement under GP § 3-306(b)(2)-(3).

(3) The information specified under paragraph (2) of this subsection shall be deemed the minutes of the open session.

(c)(1) The minutes shall reflect:
      (i) each item that the public body considered;
      (ii) the action that the public body took on each item; and
      (iii) each vote that was recorded.

The Attorney General's Open Meetings Act Manual states, "As to minutes for an open session, the Compliance Board has explained that '[e]ach item must be described in sufficient detail so that a member of the public who examines the minutes can understand the issue under consideration.'" Open Meetings Act Manual (9th ed., rev. June 2017) (quoting 3 OMCB Opinions 164, 166 (2001)).

The minutes of the October 20, 2016 meeting, which were posted online, reflect that what was under consideration was Bill 12-0152, and that the Committee voted unanimously with one member absent in a recorded roll call vote to recommend that bill "Favorable with Amendments." Appellant directs our focus to the requirement that the minutes "shall reflect *each item* that the public body considered," "the *action* that the public body took on each item," and "*each vote* that was recorded." GP § 3-306(c)(1) (emphasis added). As she sees it, the Committee considered dozens of "items," involving text, tables, and zoning map amendments, and took "over forty roll call votes and three voice votes," none of which were recorded in the minutes.

The City characterizes the votes referred to by appellant as "straw votes" used by the Committee to organize its final report on Bill 12-0152 to the Council. And, because only the Council, and not the Committee, can adopt an amendment, these organizational

votes do not constitute official actions of the Committee and do not have to be reflected in the minutes.[11]

Council Rule 10-9[12] governs a committee's actions on a bill:

(a) Each committee must report to the Council on all bills on which it has taken action.
(b) The report on each bill must be either: (1) favorable; (2) favorable with amendments; (3) unfavorable; or (4) without recommendation.
(c) (1) A committee may adopt a report only on the affirmative vote of a majority of all committee members. (2) A committee member may vote on a report or other measure only if the member is physically present when the vote is called.

Ms. Kunst testified that, in regard to Council and Committee minutes, she had looked at the minutes kept by the General Assembly and at "neighboring jurisdictions in the state" for guidance, and that the minutes for the General Assembly's Committee reports are "very similar to what we post . . . [including] attendance records and the outcomes on items considered." More specifically, she stated that the General Assembly does not "include in the minutes the individual amendment votes at Committee level." [13]

---

[11] At trial, Ms. Kunst testified that "straw votes were taken by the Committee . . . in order to organize the items that the Committee intended to put into their final report." When asked whether the Committee passes or approves amendments, she answered, "No . . . The full City Council [passes or approves amendments] generally on second reader [or] third reader."

[12] Rules of the City Council of Baltimore, 2016-2020 Council Session, *available at* http://ca.baltimorecity.gov/codes/CouncilRules.pdf

[13] Appellant presented no evidence to the contrary and does not challenge the accuracy of Ms. Kunst's testimony on appeal.

Regarding compliance with the Act, we agree with the City that the General Assembly's practice is entitled to some deference.[14] Not only is it the legislative body that enacted the Act, GP § 3-306(a) expressly states that that section of the Act does not "require any change in the form or content of the Journal of the Senate of Maryland or Journal of the House of Delegates of Maryland."

Under the Council's Rules, the Committee's singular responsibility as to Bill 12-0152 was to report to the Council in one of four ways. The report on that bill was the "item" under consideration in the October 20 Committee meeting, and it involved the inclusion or exclusion of proposed amendments. The minutes of the meeting reflect the Committee's action on that bill. We perceive no legal error in the circuit court's conclusion that the minutes at issue meet the statutory requirements.

## IV.

### "What's past is prologue"[15]
### The Council's October 24, 2016 Luncheon

*Contentions*

Appellant contends that the Council's "luncheon meeting" on October 24, 2016 violated both the notice and minutes requirements of the Act. She asserts as an

---

[14] To support this argument, the City analogizes to administrative deference: "[L]egislative acquiescence in a long-standing administrative construction gives rise to a strong presumption that the interpretation is correct." *Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 696-97 (1996) (quoting *Maryland Classified Employees Ass'n, Inc. v. Schaefer*, 325 Md. 19, 33 (1991)).

[15] William Shakespeare, *The Tempest*, Act 2, Scene 1.

20

"inconvenient truth" that the Council has continued a practice "denounced" by the *CLUB* Court in 2003.

In *CLUB*, civic organizations filed a complaint alleging that the Baltimore City Council violated the Open Meetings Act when considering a ballot initiative to restructure the Council by amending the City Charter. 377 Md. at 185-86. The Court of Appeals held that the passage of that bill was void, and ordered the removal of the question from the ballot. *Id.* at 186. The controversy revolved around the Council's meetings held on August 8, 2002 and August 12, 2002.

Although the Council President "generally gave public notice of the regularly scheduled Monday, and occasionally, Thursday night meetings of the Council, no notice of the [Thursday,] August 8 meeting was given by the President to anyone other than council members." *Id.* at 189. The Council President "had indicated that she did not want the media to be present at the August 8 meeting 'because of her fear of how the media might portray the Council when it was having heated discussions.'" *Id.* at 189. That effort was thwarted when the Baltimore Sun learned of the meeting, and two reporters and a member of the public sought admission to the meeting. *Id.* at 190-91. Informed by the press secretary that a quorum of the Council was present, they entered the meeting room. About one minute after they entered, however, the Council President determined that a quorum was not present and, without a vote, closed the meeting. *Id.*

The Council met again on Monday, August 12, 2002, holding both a luncheon meeting and a regularly scheduled meeting at 5 p.m. In regard to the luncheon meeting, the trial court had found that:

21

- No individualized notice of these meetings is published, but the City Council President prepares a memorandum to the other members with a calendar of the dates of the regularly scheduled Monday evening sessions. Luncheon meetings are noted on this memorandum with an asterisk next to the date for the regularly scheduled Monday evening session.... This calendar is prepared on a yearly basis and sent to the press. It is also posted on the website. No notice is given of the topics to be discussed at these meetings.
- Members of the media regularly attend the luncheon meetings.
- No record is kept of who attends these luncheon meetings.
- No minutes are kept of who attends these luncheon meetings.
- A quorum of the council is sometimes present at the luncheon meetings.
- Sometimes, but not often, bills are brought to the luncheon by members and other members sign them as a part of the process to bring the bills out of committee and before the entire Council for a vote.
- The restructuring bills were not discussed at the August 12, 2002 luncheon meeting.

*Id.* at 191-92. In the time between the luncheon and the 5 p.m. meeting, "the chairperson of the Judiciary and Policy Committee had obtained sufficient signatures to bring the bill on the [ballot question] out of committee and up for a vote under the rules of the Council." *Id.* at 192.

In regard to the August 8 meeting, the Court held that the Council "deliberately omitted to give notice to the media, contrary to [its] customary practice," and that once a quorum had been established and the meeting declared open, "it should not have been closed without a vote." *Id.* at 194-95. As to the August 12 luncheon meeting, the Court noted that "[a]s was the general practice, there was no individualized notice of this meeting, no record of attendance was taken, and no minutes of the meeting were kept," but it accepted the trial court's factual finding that the bill in question was not discussed at the luncheon. *Id.* at 196. "[R]eiterat[ing] that the Open Meetings Act places an

22

affirmative duty on the public body to provide notice of meetings," the Court concluded that the Council had "failed to provide adequate notice of this [luncheon] meeting, and . . . violated the [Act]." *Id.*

*Analysis*

Old habits are apparently hard to break.[16] It is undisputed that the Council held a "luncheon meeting" on October 24, 2016. Ms. Kunst testified that she attended that luncheon; that "about half of the City Council [were] in attendance;" that it was "hosted by the Mayor in the executive conference courtroom on the second floor of City Hall;" and that it started at approximately noon and ended at approximately 1 p.m. When asked about notice, Ms. Kunst stated that "notice for the lunch for the 2016 calendar year was in a memo from October of 2015," that "was posted on the baltimorecitycouncil.com part of the City Council's website . . . [and was] physically posted on the Department of Legislative Reference on their bulletin board outside of their offices." Appellant testified at trial that she had looked but did not see the "memo" and disputed whether it was actually posted online or on the bulletin board.

---

[16] Under the Act, to "meet" means "to convene a quorum of a public body to consider or transact public business." GP § 3-101(g). A quorum is "a majority of the members of a public body; or the number of members that the law requires." GP § 3-101(k). At these luncheons, a quorum of the Council may be present, and, even if not intended, "public business" may be "consider[ed] or transact[ed]." Whether or not the Council considered these luncheons to be meetings under the Open Meetings Act (the *CLUB* Court did, and the City does not argue that they are not subject to the Act; for the purposes of this opinion, we will assume that they are), they present concerns. The City Solicitor, at oral argument, indicated—wisely in our view—that these luncheons are no longer held. Whether this case played a part in that decision was not stated.

The "memo" referred to by Ms. Kunst appears to be a letter, dated October 19, 2015, from Council President Young addressed to "Honorable Councilmembers," that is titled "Draft 2016 City Council Meeting Schedule." It states that "the Council will meet year-round on Mondays (unless otherwise noted) at 5:00 p.m. in the Clarence 'Du' Burns Council Chamber." It lists 25 dates with asterisks next to some of them. The asterisks are explained at the bottom of the memo: "*Council luncheons held in the Reeves Conference Room. The Mayor will host luncheons on alternate weeks." October 24 is a listed date without an asterisk.

Regarding this luncheon, the trial court found:

[T]he evidence shows that . . . notice was given by way of an October 2015 memorandum that was posted on the City Council's website and on Legislative Reference's bulletin board. That [appellant] did not see the notice does not mean it was not provided. The court credits Ms. Kunst's testimony that notice of the luncheon, which was open to the public, was posted in advance of the luncheon.

The *CLUB* Court did not include the express language of the 2002 meeting memo, but it appears to have been very similar to the memo in this case:

No individualized notice of these meetings is published, but the City Council President prepares a memorandum to the other members with a calendar of the dates of the regularly scheduled Monday evening sessions. *Luncheon meetings are noted on this memorandum with an asterisk next to the date for the regularly scheduled Monday evening session....* This calendar is prepared on a yearly basis and sent to the press. It is also posted on the website. No notice is given of the topics to be discussed at these meetings.

377 Md. at 191 (emphasis added).

The Act states that "[i]t is essential to the maintenance of a democratic society that, except in special and appropriate circumstances[,] public business be conducted

24

openly and publicly; and the public be allowed to observe the performance of public officials; and the deliberations and decisions that the making of public policy involves." GP § 3-102(a). Therefore, except for statutorily permitted closed meetings, "it is the public policy of the State that the public be provided with adequate notice of the time and location of meetings of public bodies, which shall be held in places reasonably accessible to individuals who would like to attend these meetings." GP § 3-102(c). More specifically, "[w]henever reasonable, a notice . . . shall . . . be in writing," and "include the date, time, and place of the session." GP § 3-302(b).

The trial court's finding that the Draft 2016 City Council Meeting Schedule was posted online and on the bulletin board is not clearly erroneous, but that document is hardly a model of clarity. Ms. Kunst explained that "the asterisk indicates the host of the lunch, not whether or not there is a lunch." She continued, "[T]he asterisk indicates the host of the lunch is the City Council President in the Reeves room," and "if there's not an asterisk, the host lunch is hosted by the Mayor's office." That is not an unreasonable reading of the notice. But, even if a member of the public recognized that the dates listed without asterisks indicated that the luncheon would be hosted by the Mayor, it does not state the time or where the luncheon would be held if it is not in the Reeves Conference Room.[17]

---

[17] Based on Ms. Kunst's testimony, the October 24 luncheon was not held in the Reeves Conference Room, but rather in the Mayor's executive conference room on the second floor of City Hall.

In short, the purported notice does not comply with the requirements of the Act.[18]

And, it is undisputed that no minutes were kept or posted for the luncheon meeting at issue.

Any errors aside, an action of a public body may be declared void only "if the court finds that the public body *willfully failed* to comply with . . . § 3-302 [notice requirement] . . . or § 3-306(c) [minutes requirement] of this title and that no other remedy is adequate." GP § 3-401(d)(4) (emphasis added). The *CLUB* Court held that "the Council willfully failed to comply with . . . the Open Meetings Act, and that the appropriate remedy was to declare [its] action . . . void." 377 Md. at 196-97. In reaching that conclusion, it did not focus as much on the luncheon meeting deficiencies as it did on the August 8 Council meeting, during which the Council demonstrated its intention to "conduct the[] deliberations away from the scrutiny of citizens and the media" and "successfully excluded citizens and the media from the meeting, where, presumably, the bill was discussed." *Id.* at 196. By providing no notice and closing the meeting when the press and the public arrived, the Council "willfully" intended to "prevent[] members of the public from observing most of the deliberations on the issue, in direct contravention to the expressly stated policy of the Open Meetings Act." *Id.* That is a far cry from what happened in this case.

---

[18] On appeal, the City does not expressly address appellant's argument that the notice did not satisfy the notice requirements of GP § 3-302(b). It focuses on the posting of the notice and that the evidence supported the trial court's finding that Transform Baltimore was not discussed at the luncheon. It contends that any errors related to notice and the lack of minutes were not prejudicial.

26

The trial court found that:

> the only credible evidence presented at the time of trial on the issue of whether [Bill 12-0152] was addressed at the meeting shows that members of the City Council engaged in no discussion of the Bill at [the] October 24, 2016 luncheon.  Thus, [appellant's] allegation that the deliberative process was a part of the lunch meeting is simply unsubstantiated by the evidence.

Appellant, who did not attend the luncheon, provided no evidence that Bill 12-0152 was discussed.[19]  Ms. Kunst testified that she was at the October 24 luncheon and that "there was not any discussion of Transform Baltimore."  She explained that during such luncheons, "there's generally some presentation and group discussions," but "there was no official or formal conversation among the group of Council members or members of the public about Transform Baltimore that day."  When asked if there could have been informal discussions, she conceded, "I would suppose so."

The circuit court found that "the only credible evidence presented" at trial showed that "members of the City Council engaged in no discussion of [Bill 12-0152]" at the October 24, 2016 luncheon.  That finding is not clearly erroneous.  The court concluded:

> [Appellant] failed to produce any evidence to support [her] claim that [the City] committed any actionable violation of the Open Meetings Act.  While the process was not perfect in that errors in the process necessitated corrective legislation, there is no indication that the errors were the result of anything more than human error.  That there may have been error in the

---

[19] As previously discussed, appellant asserts that the application of legislative privilege prejudiced her ability to acquire such evidence.  We note that legislative privilege was neither raised nor discussed in *CLUB*.  She also points out that the *CLUB* Court reached the issue of the Council President's motives and intentions, stating that the Council President "had indicated that she did not want the media to be present at the August 8 meeting 'because of her fear of how the media might portray the Council when it was having heated discussions.'"  377 Md. at 189.  We do not know how the information came to the circuit court in that case.

27

zoning map that led to a need for corrective action does not give rise to a cause of action.

We understand this to mean that there was no willful violation of the Act. And, we agree that the violations related to the luncheon do not rise to the level of a willful violation that would permit voiding the legislation. *See* GP § 3-401(d)(4). But that does not mean that some "other appropriate relief" cannot be granted. *See* GP § 3-401(d)(6).

On appeal, appellant has requested a remand to the circuit court for it to consider other appropriate relief. In her petition for enforcement of the Act, she requested, among other things, that the circuit court award her reasonable counsel fees and other litigation expenses. The record indicates that the issue of counsel fees and litigation expenses was not addressed by the circuit court, presumably because it found no "actionable violation." To the extent that the trial court may have considered only a "willful" violation to be actionable, a finding of willfulness would not be necessary to an award of counsel fees and litigation expenses.

GP § 3-401(d)(5) provides that, as part of its judgment, a court may "assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred." To be sure, appellant's primary goal was to have Bill 12-0152 declared void based on a willful violation of the Act, but that is not the sole measure of success in litigating a violation of the Act. As the Court of Appeals, interpreting an earlier version of the statute, has explained:

> In light of the Act's goals and purpose . . . we interpret the qualifier "prevails" as being determinable according to the parties' respective success litigating the seminal Open Meetings Act violation claim, regardless of the specific remedies sought, or whether any or all of those

28

remedies are achieved.  To conclude otherwise that the non-governmental party qualifies as a "prevailing" party only if that party obtains an injunction, a declaration of invalidity of the legislative act, or achieves other remedies following establishment of the merits of its foundational claim seems to us to run counter to the intent of the Act[.]

*Armstrong v. Mayor and City Council of Baltimore*, 409 Md. 648, 693 (2009).

In light of our finding regarding the luncheon meeting, we will remand this case for the circuit court to determine whether counsel fees and litigation expenses[20] should be awarded and, if so, the amount of any award.

> **CASE REMANDED FOR THE SOLE AND LIMITED PURPOSE OF CONSIDERING AN AWARD OF COUNSEL FEES AND LITIGATION EXPENSES.  JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY OTHERWISE AFFIRMED.  COSTS TO BE PAID 3/4 BY APPELLANT AND 1/4 BY THE MAYOR AND CITY COUNCILOF BALTIMORE.**

---

[20] The *Armstrong* Court explained that its "ruling here does not mean necessarily that it would be an abuse of discretion for a trial judge to deny attorney's fees to a litigant who proves a violation of the Act.  Each case will rise or fall on its own unique circumstances and the trial court's articulated or discernable exercise of discretion."  409 Md. at 694.

# APPENDIX

Appellant's counsel proffered questions for Council President Young, which we have rephrased and condensed as follows:

- Were you a Council member when the Court of Appeals rendered its decision in *CLUB*?
- Identify the time and location of the luncheon meeting on October 24, 2016.
- Identify each person who attended and the purpose of the luncheon.
- Identify subjects that were considered, mentioned, and discussed at the luncheon.
- Why was the luncheon not announced at the Council meetings of September 19, 2016 or October 20, 2016?
- Identify each person with whom you communicated or met during the period of October 18-24, 2016 regarding the Committee action on Bill 12-0152.
- Identify the measures, if any, that you took to ensure that the "packets" of amendments to Bill 12-0152 that were placed before the Council at its 5 p.m. meeting of October 24 were true and complete representation of the items approved by the Committee.
- Identify the measures, if any, that you took to ensure the Council actions on Bill 12-0152 at the 5 p.m. meeting of October 24 would not result in conflicting zoning map designations for the same property.
- Identify the date, time, procedure of the Council's decision that amendments to Bill 12-0152 could be adopted on the floor:
  - Without being read aloud, as set forth in Council Rule 11-6-C-1; and
  - Without being formatted as set forth in Council Rule 11-5A.
- If there were not enough time before the 5 p.m. Council meeting of October 24 to ensure the "packets" of amendments were true and complete representation of the items approved by the Committee, to conform to Council Rule 11-5, and to ensure no conflicting zoning map designations, why did you go forward with second reading at that meeting?
- Identify the procedure, if any, by which Bill 12-0152 could have passed by the end of the legislative session on December 5, 2016 had it not had its second reading on October 24, 2016.
- Identify each person with whom you communicated or met regarding the Port Covington amendments to Bill 12-0152 during the period of October 18-24.
- Identify each person with whom you communicated or met during the period of October 18-24 until the beginning of the 5 p.m. meeting regarding:
  - Councilman Mosby's alcohol amendments;
  - Specifically whether Councilman Mosby's alcohol amendments presented a threat to the final passage or signing of Bill 12-0152;

- o Specifically whether Councilman Mosby's amendments presented a threat to the Port Covington project;
  - o Procedures for defeating Mosby's amendments.
- At the 5 p.m. meeting on October 24, did you call for a vote instead of a discussion immediately after Mosby's alcohol amendments were moved and accepted?
- At the 5 p.m. meeting, what were you saying and to whom while Mosby had the floor regarding his alcohol amendments?
- Isn't it true that Council adopted or approved conflicting map designations at the 5 p.m. meeting on October 24?
- Identify each vote taken by the Council in calendar year 2016 to close a meeting pursuant to the Open Meetings Act.

Appellant's counsel proffered questions for Councilman Reisinger, which we have rephrased and condensed as follows:

- Why was the luncheon not announced at the Council meetings of September 19 or October 20?
- Identify the date, time, location, and procedure of the Committee's decision that actions taken at earlier voting sessions on Bill 12-0152 could be reversed or altered on October 19-20 without votes to rescind or to amend.
- Isn't it true that during the October 19 Committee meeting, you turned the microphone away, or covered it with your hand, and had private discussions involving a quorum of the Committee?
- Isn't it true that the October 20 Committee meeting was the only public meeting on Bill 12-0152 in 2016 for which an audio-visual recording was not made?
- What time did you recess the October 20 Committee meeting in the morning? What time did you reconvene in the afternoon?
- Identify the votes taken at the October 20 meeting on the Bill before the recess, and those votes taken after the recess.
- Identify each person with whom you communicated or met during the recess.
- Why did the Committee make "bed and breakfast" a prohibited use in the R-5 through R-10 zones on October 20 after voting to making it a CO use in those zones at its February 19, 2016 voting session?
- Why did the Committee make "fraternity and sorority" a prohibited use in the C-4 zone on October 20 after voting to making it a CO use in that zone at its February 19 voting session?

31

- Why did the Committee make "check cashing establishment" a CO use in the C-1 through C-3 zones on October 20 after defeating the motion to that effect at its March 4, 2016 a.m. voting session?
- Why did the Committee set the minimal lot area per dwelling unit in the C-1 zone at 300 square feet on October 20 after voting to make it 325 square feet in that zone in its March 4, 2016 p.m. voting session?
- Why did the Committee set the minimal lot area per dwelling unit in the C-1-E at 550 square feet on October 20 after voting to make it 325 square feet in that zone at its March 4 p.m. voting session?
- Why did the Committee set the minimal lot area for dwelling in C3 zone at 300 square feet on October 20 after voting to make it 225 square feet in that zone at its March 4 voting session?
- Why did the Committee set the minimal lot area for dwelling units in the C-4 zone at 300 square feet on October 20 after voting to make it 225 square feet in that zone at its March 4 voting session?
- Isn't it true that the Committee adopted or approved conflicting zoning designations for some properties at its October 20 meeting?
- Why did the Committee "minutes" for October 20 not include all votes taken at that meeting?
- Identify each person with whom you communicated or met between the October 20 Committee meeting and the Council's 5 p.m. meeting on October 24.
- Identify the measures, if any, that you took to ensure that the "packets" of amendments to Bill 12-0152 that you placed before the Council on October 24 were a true and complete representation of what the Committee had approved.
- Did you attend any portion of the Council's luncheon meeting on October 24?
- Identify each person present at the luncheon meeting.
- Identify the subjects that were considered, mentioned or discussed at the luncheon.
- Identify each person with whom you communicated or met during the period of October 18-24 until the beginning of 5 p.m. Council meeting regarding Councilman Mosby's alcohol amendments.
- Identify each person with whom you communicated or met prior to the 5 p.m. meeting of October 24 regarding procedures for defeating Councilman Mosby's alcohol amendments.