## WILMA JEAN CALDWELL v. STATE OF MARYLAND

[No. 1297, September Term, 1981.]

*Decided June 2, 1982.*

The cause was argued before MORTON and WILNER, JJ., and STANLEY B. FROSH, Associate Judge of the Sixth Judicial Circuit, specially assigned.

*Michael E. Kaminkow,* with whom were *Wartzman, Rombro, Rudd & Omansky, P.A.* on the brief, for appellant.

*Richard B. Rosenblatt, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *David*

*Bortz, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Because it is supported by the record, we shall substantially adopt the appellant's recitation of the factual posture in which this appeal reaches us from the Criminal Court of Baltimore.

"On June 11, 1981, pursuant to a plea agreement, Appellant entered a guilty plea to one count of theft and one count of conspiracy to violate the theft laws. In consideration of Appellant entering the guilty plea, the State would recommend at the time of sentencing, a sentence of not more than three years on each count, to run concurrently. Further, in the event the Court at the time of disposition determined that this was an appropriate case for probation and restitution, then Appellant agreed to enter guilty pleas to the remaining felony theft cases in order to provide a substantive factual basis to support an order of restitution in all cases. In the event the Court incarcerated the Appellant for any period of time up to three years, the State agreed to nol pros the remaining indictments and counts. The Court then qualified Appellant on the voluntariness of her plea, after which the Court found that the plea offered by Appellant was voluntarily, intelligently and knowingly made.

The State then presented to the Court the factual basis for the plea which can be briefly summarized. The State would have called co-defendant, Arnetta Vines, formerly an employee of Provident Hospital, who would have testified that upon the instructions of another co-defendant, Eddie Junior Smith, she prepared various documents from Provident Hospital, including bills for medical services, hospital reports, and clinic appointment slips, all of which were presented by Appellant to the Nationwide Insurance Company in a claim for damages allegedly resulting from injuries sustained in an automobile accident occurring on July 19, 1980. In addition to the medical documents presented to Nationwide Insurance Company, Appellant

submitted a false and forged statement of lost wages incurred by Appellant as a result of her employment at the Baltimore Symphony Orchestra. There was no automobile accident, but in fact, a staged intentional collision of two automobiles for the purpose of defrauding the Nationwide Insurance Company. As a result of the fraudulent claim, Nationwide Insurance Company paid to Appellant $696.00. The State further produced, as part of its factual basis, the fact that Arnetta Vines prepared additional fraudulent hospital bills, records and clinic slips for Appellant, involving three additional phony accidents occurring on July 27, 1980, August 18, 1980, and September 16, 1980. Fraudulent claims were filed with various insurance companies as a result of these alleged accidents, all of which were settled for various sums. One or more of the co-defendants and co-conspirators participated with the Appellant in perpetrating the conspiracy to violate the theft laws.

On July 29, 1981, Appellant came before the Court for sentencing, at which time counsel for Appellant moved for a mistrial based on alleged substantive *ex parte* communications between the Court and the prosecutor, prior to the sentencing proceeding, and subsequent to the taking of the guilty plea. After an exchange between the Court and counsel for Appellant, counsel called David Bortz, prosecutor to the witness stand to be sworn and testify at the penalty phase of the proceeding. The Court inquired as to the reason counsel was calling the prosecutor to the stand at which time counsel advised the Court that he wanted the prosecutor to state, under oath, whether or not he had *ex parte* discussions with the Court as to sentencing matters regarding Appellant or her co-conspirator and paramour, Brent Dillard, who had been previously sentenced to four years incarceration. The Court then stated as follows:

THE COURT:

'I talked to Mr. Bortz about the scenario of all these cases. I have gone over the probation report, the same as I have gone over with other state's attorneys, because there are certain things in the

probation report that I don't understand and certain things are wrong. I got a probation report this morning with the wrong person.'

After a short colloquy, the Court went on as follows:

THE COURT:

'What is the purpose of Mr. Bortz' relation to your case, the Caldwell [appellant's] case? Mr. Bortz was not talking to me about the Caldwell case, I called him as a result of another case which is in for disposition this morning.'

MR. KAMINKOW [Counsel for Defendant]:

'A co-defendant in this case.'

THE COURT:

'That is correct.'

The prosecutor, David Bortz, was then sworn as a witness. When asked whether he visited Judge Dorf and had *ex parte* communications with him, he acknowledged that he visited the Court once regarding Brent Dillard, a co-defendant and co-conspirator, but didn't recall when that visit occurred. The Court then interrupted the witness' testimony to answer the question propounded to the witness and stated:

THE COURT:

'I could refresh his recollection, it was after the Motion for Reduction of Sentence was filed. I don't know what date it was when I asked him to come over.'

MR. KAMINKOW:

'Your Honor, with all due respect, I have him under oath, how can you comment on what he is testifying to.'

THE COURT:

'I will ask him to step down.'

MR. BORTZ:

'Thank you, Your Honor.'

MR. KAMINKOW:

'I move for a mistrial.'

THE COURT:

'Let him finish. I will ask you a question also. Let him finish.' . . .

BY MR. KAMINKOW:

Q. 'What was the purpose of the visit?'

A. 'I was summoned to speak with Judge Dorf, the meeting did not occur at any negotiation.'

Q. 'You are saying the Court summoned you?'

A. 'Yes.'

Q. 'What was the nature of the conversation?'

A. 'The Judge asked me what my view was with regard to Dillard and the sentence that he received.'

Q. 'And what was your response?'

A. 'I indicated to the Judge that the State's position was that the full four years should be served and that was what I recommended in the sentencing and I continued to argue. I did file a response, I believe, to the Motion to Reduce Sentence. . . .'

Q. 'And that was the only occasion that you went to see Judge Dorf *ex parte* to discuss any of the defendants in this series of cases?'

A. 'When I arrived at the Judge's office this morning, I picked up the pre-sentence reports. I walked in there with you this morning and I had not seen either report and not spoken to the Judge on the matter, shortly after I arrived, the Judge asked me to come into his office for a moment, indicating they had some problems, incarceration problems on Arnetta Vines.'

After further argument by counsel, and a plea by Appellant, the Court sentenced Appellant and made in part the following remarks:

'We have here over 12 defendants with a very, very complicated scenario of events. All you have to do is

to take a look at the chart on the blackboard to see the complication of the entire scheme. There were large sums of money involved and many, many insurance companies and it involved many, many individuals, and which involved numerous individuals over a long period of time. There is no way that you can separate the offenses here. The offenses are a part of a conspiracy type of offense and you must take the offense and try to assess the culpability of the defendant's past in the scenario of events, and based on the events and background of the people and criminal records, and so forth, and assess what are the proper sentences.'"

It is in light of this factual background that the appellant raises the following issue:

"Where the State proposes a sentencing pattern structured on each defendant's culpability in the overall scheme or conspiracy and the prosecutor and judge engage in *ex parte* communications regarding sentencing matters as to one or more of the co-defendants and co-conspirators, the appellant is so prejudiced and the sentencing proceeding so tainted as to require a remand for resentencing before another judge."

Maryland Rule 1231, paragraph XVI, entitled "*Ex Parte* Communications," provides, in part:

"A judge should not permit private interviews, arguments, or communications designed to influence his judicial action, where interests to be affected thereby are not represented before him, except in cases where provision is made by law for *ex parte* application.

... Ordinarily all communications of lawyers to the judge intended or calculated to influence action should be made known to opposing counsel."

Here we have the trial judge and the prosecuting attorney

acknowledging that they conferred, in the absence of defense counsel, in order to discuss the sentence to be imposed on two of the appellant's co-defendants. It is true that the trial judge specifically disavowed that he and the prosecutor had talked about the appellant's case. On the other hand, the trial judge had previously asserted that he and the prosecutor had "talked . . . about the scenario of all these cases." Moreover, the trial judge stated: "We have here over 12 defendants with a very, very complicated scenario of events. All you have to do is to take a look at the chart on the blackboard to see the complication of the entire scheme."

Appellant contends that "[t]he State's proposed sentencing pattern linked all the Defendants, including the Appellant, in a pyramid sentencing structure placing the most culpable Defendants at the top and least culpable at the bottom." While we are not prepared to say that the record supports this flat assertion, it is self-evident that the interrelationship of the various defendants' culpability would heavily influence the trial judge in determining the sentence to be imposed upon each of the many co-defendants.

It is true the trial judge recognized that "you must take the offense and try to assess the culpability of the defendant's past in the scenario of events, and based on the events and background of the people and criminal records, and so forth, and assess what are the proper sentences." The fact remains, however, that he did discuss with the prosecuting officer "the scenario of all the cases." While the judge's *ex parte* conference with the prosecuting attorney may have come about in all innocence and good faith, we cannot say with certitude that their discussion resulted in no impact upon the judgment of the trial judge in imposing sentence upon the appellant.

We are fortified in this conclusion in view of the result reached by the Court of Appeals in *Scott v. State,* 289 Md. 647 (1981), where it was made clear, although under a different factual setting, that the sentence of an accused which may have been influenced by a recommendation given to the

sentencing judge by a representative of the Supreme Bench Medical Office, unknown to defense counsel at the time, must be vacated and a resentencing procedure conducted.

Accordingly, we shall vacate the sentences imposed upon appellant and remand the case for sentencing by a judge other than the original sentencing judge.

> *Judgments affirmed except as to the sentencing; sentences vacated and case remanded for sentencing; appellant to pay one-half the costs of this appeal; one-half the costs to be paid by the Mayor and City Council of Baltimore.*