*B. O. v. S. O.*, No. 1202, Sept. Term 2020, Opinion by Wells, J.

**FAMILY LAW—** *DE FACTO* **PARENTHOOD**

A *de facto* parent generally describes a party who claims custody based upon the party's relationship with a non-biological, non-adopted child. Establishing *de facto* parenthood requires that the third party meet a high bar, that cannot be achieved without knowing participation by both parents. *Conover v. Conover*, 450 Md. 51, 74 (2016); *E.N. v. T.R.*, No. 44, Sept. Term 2020, Slip Op. at 70, (decided: July 12, 2021).

**FAMILY LAW—***DE FACTO* **PARENTHOOD**

Under *Conover* and now *E.N.*, the third party bears the burden of proving four factors. First, the third party must prove that "the biological or adoptive parent(s) consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child." Second, the third party must establish "that the petitioner and the child lived together in the same household." Third, the third party must prove "that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation." Finally, the third party must demonstrate "that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature." Here, the circuit court did not err in finding that the third-party was not a *de facto* parent because she could not establish that one of the parents, despite battling a drug addiction and facing housing challenges, among other things, had consented to the third-party establishing a parent-like relationship with the child.

**FAMILY LAW—PARENTAL FITNESS**

A third-party seeking custody must show the "unfitness of the natural parents or that extraordinary circumstances exist before a trial court could apply the best interests of the child standard." Here, the circuit court did not err as the third-party could not establish that the natural parent was unfit, even though the parent suffered from depression, was a recovering drug addict and alcoholic, and had previously been the subject of a domestic violence petition filed by the third-party but ultimately dismissed by the court.

**FAMILY LAW—ABUSE OF DESCRETION—EXCLUSION OF NON-PARTIES**

Once a court determines that a third-party petitioner claiming *de facto* parentage has not sustained their burden, they are no longer a party to the case and have no standing to contest subsequent court decisions.

**FAMILY LAW—NEGLECT ALLEGATIONS—FINAL HEARING—FL § 9-101 FINDINGS**

Where allegations of parental abuse or neglect have been made, before a court awards custody or unsupervised visitation of a minor child the court must engage in a two-step process. First, the court must consider whether there are reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding. Second, the court must determine whether it has been demonstrated that there is no likelihood of further abuse or neglect by the party. Here, the court did not abuse its discretion in ordering DSS to do a follow-up investigation of Mother and child before awarding Mother final custody because of a prior finding that Mother had neglected the child.

Circuit Court for Montgomery County
Case No. 16322202FL

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1202

September Term, 2020

_____

B. O.

v.

S. O.

_____

Kehoe,
Wells,
Wright, Alexander, Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wells, J.

_____

Filed: September 8, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal concerns appellant, B. O.'s ("Aunt"), attempt to obtain custody of K, a boy born on January 18, 2017, to appellee, S. O. ("Mother"), and L. R. ("Father").[1] After the parties filed an extensive number of pleadings and participated in several hearings regarding K's custody, the Circuit Court for Montgomery County ultimately awarded custody to Mother and Aunt appealed.[2]

Aunt poses several questions for our review which we have rephrased and condensed for clarity,[3]

_____

[1] Because K is a minor, we will only use an initial, rather than his name. And because of the allegations raised below affecting the minor child involved allegations of physical abuse and neglect, we will use the parties' initials only.

[2] At the time that Aunt's custody petition was filed in the circuit court, Father was serving multiple life sentences for murder. He failed to answer the pleadings and the court entered a default judgment against him.

[3] Appellant's verbatim questions are:
I.     Did the court err in failing to apply the *Conover* test?
II.    Did the court err in not finding defendant unfit?
III.   Did the court err in never considering K's best interests?
IV.    Did the court err when it failed to strike defendant's post-trial affidavits?
V.     Did the court err by denying plaintiff's motion *in limine*?
VI.    Did the court err by excluding plaintiff and plaintiff's counsel?
VII.   Did the court err by conducting *ex parte* hearing?

Even though she did not file a counter-appeal, Mother posed the following verbatim questions:
I.     Did the Court err in upholding Mother's constitutional right to parent?
       a. Did the Court err in finding Aunt is not a *de facto* parent under the first prong of *Conover*?
       b. Did the Court err in finding that Aunt failed to meet her burden of proving Mother's parental unfitness?
       c. Did the Court err in not considering the best interests of the child where Aunt failed to prove that she is a *de facto* parent or that Mother is unfit?
II.    Did the Court abuse its discretion in not striking Mother's interim Affidavits where the Court did not consider them in its ruling?

I. Did the trial court err in concluding that Aunt was not entitled to custody because she did not prove that she was a *de facto* parent, nor did she prove that Mother was unfit?

II. Did the trial court err in failing to consider K's best interests when Aunt failed to establish that she was a *de facto* parent or that Mother was unfit?

III. Did the trial court abuse its discretion when it denied Aunt's motion to strike Mother's post-trial affidavits, even though the court stated it did not consider the affidavits?

IV. Did the court abuse its discretion when it denied Aunt's Motion *in Limine* to strike the testimony of Shanie Yates?

V. Did the court abuse its discretion when it excluded Aunt and Aunt's counsel from the final hearing because the court concluded that Aunt was no longer a party to the proceedings?

For the reasons that we discuss, we shall affirm the judgments. Specifically, we hold that the court did not abuse its discretion in finding that Mother was entitled to custody because Aunt could not prove that she was K's *de facto* parent, nor could Aunt prove that Mother was unfit to parent K. Despite Aunt's protests to the contrary, the court did not need to conduct a best interest of the child analysis because Aunt could neither prove *de facto* parentage nor could she overcome the presumption that Mother was fit. The court did not abuse its discretion in refusing to grant Aunt's motion to strike Mother's post-trial affidavits because they were not *ex parte* communications, as Aunt contended. And, Aunt could not show that the affidavits influenced the court's decision. The court properly denied Aunt's Motion *in Limine* to strike witness Shanie Yates' testimony because Aunt's

III. Did the Court abuse its discretion in allowing a witness to testify after she failed to appear for a deposition for which she was not properly served?

IV. Did the Court abuse its discretion in conducting a final hearing without Aunt and Aunt's counsel present?
   a. Did the Court abuse its discretion in excluding Aunt from a hearing where she is not a party?
   b. Did the Court abuse its discretion in holding a final hearing?

2

basis to exclude that testimony was that Ms. Yates failed to appear for a deposition. But the record shows that Aunt failed to properly serve Ms. Yates with a notice of the deposition. As a result, Ms. Yates had no notice of the deposition and was not obligated to appear. Aunt was properly excluded from further custody proceedings because she has no constitutional right to parent K after she could not prove *de facto* parenthood or that Mother was unfit. Finally, in determining whether Mother was likely to neglect or abuse K in the future under Family Law § 9-101, the court was within its discretion to order the local Department of Social Services to perform a follow-up assessment of K and Mother. In so doing, the court did not transform the proceedings into a CINA hearing, as Aunt contends.

## BACKGROUND FACTS

S. O. ("Mother") is the biological parent of K, the minor child who is the focus of this case. She is also the mother of two other children who are not involved in these proceedings. Mother is a resident of Prince George's County, Maryland. B. O. ("Aunt") is a Montgomery County resident. While Mother was pregnant with K, L. R., K's father was arrested for committing multiple murders and is serving multiple life sentences.

### A. Aunt's Efforts to Obtain Custody

Aunt cared for K when he was a few months old after he was removed from Mother's custody due to child neglect and domestic violence. On March 16, 2017, Aunt filed a protective order against Mother on behalf of K in Prince George's County. Mother contested the order. The order was granted for one year based on a finding of neglect. The order expired in 2018. Despite the protective order's expiration, K continued to live with

3

Aunt up and until the trial court awarded temporary custody to Mother on December 4, 2020.

In May 2017, Mother enrolled in a substance use program run by Fields and Fields.[4] While the protective order was in place, Mother saw K at Aunt's sole discretion, usually on the weekends.

At trial, Mother testified that she began living in the Fields and Fields residential addiction treatment program in January 2019 and continued to reside there until spring 2020. Once Mother moved into the Fields and Fields facility, K began spending overnights with Mother. The trial court found that K continued to primarily reside with Aunt while Mother lived at Fields and Fields, despite Mother testifying that K lived with her at Fields and Fields from January 2019 to July 2019.

On January 2, 2019, Aunt filed a new protective order against Mother on behalf of K in the Circuit Court of Prince George's County. The court entered a temporary protective order on January 2, 2019 but denied a final protective order on January 9, 2019 because Aunt failed to appear.

Following a visit to Kings Dominion amusement park in July 2019, which all parties attended, Aunt filed several protective order petitions alleging that Mother had abused K. On July 10, 2019, Aunt filed a protective order petition against Mother on behalf of K in Prince George's County. The court granted the temporary protective order that day but did

---

[4] Fields and Fields is a Medicaid-funded substance use treatment center that provides group classes on substance use, GED preparation, group and individual therapy, and substance use screening. https://fieldsandfieldstreatmentcenter.com. https://bit.ly/3s5ZByy. (Last visited: August 8, 2021.)

not enter a final protective order one week later because Aunt did not meet the statutory burden of proof.

On July 17, 2019, the same day the final protective order was denied in Prince George's County, Aunt filed an identical petition for protection on K's behalf in the Montgomery County District Court. That court issued a temporary protective order. At the final hearing on July 24, 2019, the court dismissed the petition based on *res judicata*. On the same day that the District Court dismissed the petition, Aunt filed for emergency custody in the Circuit Court for Montgomery County. It is that case which forms the basis of this appeal.

### B. Mother's Protective Orders Against Aunt

Mother filed a petition for protection against Aunt on July 9, 2019 before Aunt initiated the July 2019 custody filings. At trial, Mother testified that she had applied for public benefits for K in Maryland but was denied them because Aunt was already receiving public benefits for K in the District of Columbia. Mother informed the authorities in the District of Columbia that K did not live there and the authorities in the District subsequently terminated K's benefits, raising Aunt's ire against Mother.

After the termination of benefits, Mother testified that Aunt made several threats against her. At trial, Mother testified about Aunt's repeated abuse towards her as a child and how Aunt had assaulted Mother as an adult. Aunt consented to an order of protection. The protective order did not involve custody. On July 26, 2019, Mother filed criminal kidnapping charges against Aunt after Aunt refused to return K after the expiration of the

temporary protective order. The State entered those charges *nolle prosequi* on September 16, 2019.

## C. Access to the Child

At trial, Mother testified that she was asked to leave Fields and Fields due to the constant police presence caused by Aunt and Aunt's counsel sending the police to the facility. After she left Fields and Fields in February 2020, Mother moved into the home of Shanie Yates' uncle in Greenbelt, Maryland, but did not tell Aunt. Mother testified that Aunt refused to allow her to see K unless Mother revealed where she was living. Mother explained that because there was still an active protective order between Aunt and Mother, she felt uncomfortable providing Aunt with the address. In the spring of 2020, Mother moved in with the parties' mother, C. O., in Clinton, Maryland. Mother moved in with C. O. because Aunt refused to let Mother see K. Once Mother moved in with C. O., K began spending time with both Aunt and Mother under the *pendente lite* access order. Mother was living with C. O. at the start of the trial.

## D. Withdrawal of Aunt's Support following Trial

At the end of the trial on November 10, 2020, the court set a hearing for the ruling on December 1, 2020. Between the close of the evidence and the court's ruling, Mother filed two affidavits with the court because Mother was asked to leave C. O.'s home and Aunt was withholding access to K.

On December 1, 2020, the court concluded that Aunt did not meet her burden of proving she was a *de facto* parent or that Mother was unfit, thus the court awarded custody of K to Mother. Following Md. Code Ann., Fam. Law Article ("FL") § 9-101, the court

6

ordered the Prince George's County Department of Social Services ("DSS") and/or the Montgomery County DSS to assess whether K was a Child in Need of Assistance (CINA) and submit a full report. While the court acknowledged that Mother had made positive strides since the 2017 finding of neglect, a further assessment was necessary to ascertain any possibility of future neglect to comply with the requirements of FL § 9-101.

On December 21, 2020, the court reviewed the report provided by DSS and a memorandum from Mother's attorney that provided updates regarding Mother's employment and housing and K's daycare situation. Before awarding full custody to Mother, the court considered all the evidence as well as testimony from Mother regarding her current circumstances.

## STANDARD OF REVIEW

This Court reviews "both the law and evidence" when reviewing actions tried without a jury. Rule 8-131(c). We "will not set aside the judgment of the trial court on the evidence unless clearly erroneous." *Id.* Custody decisions are reviewed for abuse of discretion, but if the order "involves an interpretation and application of statutory or case law, [then] we review the trial court's conclusions *de novo*[.]" *Kpetigo v. Kpetigo*, 238 Md. App. 561, 568 (2018) (citing *Walter v. Gunter*, 367 Md. 386, 391-92 (2002)); *North v. North*, 102 Md. App. 1, 13 (1994) (explaining that custody or visitation decisions are reviewed based on Rule 8-131(c)). This Court gives "due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* On review, we grant the trial court broad discretion "because only [the trial court] sees the witnesses and the parties, hears the testimony and has the opportunity to speak with the child." *Burak v. Burak*, 455 Md. 564,

7

617 (2017) (quoting *In Re Yve S.*, 373 Md. 551, 586 (2003)). Comparatively speaking, the trial court "is in a far better position . . . to weigh the evidence" and determine custody, than an appellate court that "has only a cold record before it." *Id.*

This Court will not disturb the trial court's decision if it was based upon "sound legal principles and . . . factual findings that are not clearly erroneous." *See Davis v. Davis*, 280 Md. 119, 125-126, *cert. denied*, 434 U.S. 939 (1977). We will not reverse a trial court's decision simply because we would not have made the same ruling. *North v. North*, 102 Md. App. 1, 14 (1994). An abuse of discretion occurs "where no reasonable person would take the view adopted by the trial court." *Floyd v. Balt. City Council*, 241 Md. App. 199, 208 (2019); *In Re Yve S.*, 373 Md. at 586 (noting abuse of discretion may also occur when "the court acts 'without reference to any guiding rules or principles" (quoting *In re Adoption/Guardianship No. 3598*, 346 Md. 295, 312-12 (1997))). The decision being challenged "has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Brown v. Daniel Realty Co.*, 409 Md. 565, 601 (2009) (quoting *King v. State*, 407 Md. 682, 697 (2009)). An abuse of discretion results when the trial court's decision "does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective." *Id.* "An abuse of discretion should only be found in the extraordinary, exceptional, or most egregious case." *Wilson v. John Crane, Inc.*, 385 Md. 185, 199 (2005).

**DISCUSSION**

**I.    THE TRIAL COURT PROPERLY GRANTED MOTHER CUSTODY BECAUSE AUNT DID NOT PROVE THAT SHE WAS A *DE FACTO* PARENT OR THAT MOTHER WAS UNFIT.**

### a.  Parties' Contentions

Aunt contends that the court erred in concluding that she was not a *de facto* parent and in finding Mother was fit.  Aunt argues that the trial court erred when it "totally changed its mind" in awarding custody to Mother at the close of the trial.  Aunt asserts that the court only focused on Mother's opposition to Aunt being a *de facto* parent during litigation and the criminal case pending against Aunt that Mother filed after this case began.  Aunt also asserts that the trial court failed to conclusively determine whether Mother was fit.  Given that K had lived with Aunt since he was a few months old, Aunt asserts that the court was "required to determine whether [Mother was] a 'fit' or 'unfit' parent."  Therefore, she contends that the Custody Orders regarding both *de facto* parenthood and parental fitness must be vacated with the case remanded for a new trial.

Mother contends that the court properly exercised its discretion in concluding that Aunt did not establish *de facto* parenthood because Aunt could not establish that Mother had consented to a parental relationship between Aunt and K.  Mother contends that she has a constitutional right to parent and that right can only be overcome through a finding of unfitness or exceptional circumstances—neither of which Aunt proved.  Mother argues that the court's decision to award her custody was not an abuse of discretion because it was based on the evidence before the court.

9

### b. Mother's Constitutional Right to Parent

The Supreme Court of the United States has consistently recognized that the Due Process Clause of the Fourteenth Amendment necessarily "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *see also Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (recognizing that a parent has a "substantial and cognizable interest in retaining custody of their children"); *Pierce v. Soc'y of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (holding that under the Due Process Clause, liberty includes the rights of parents to "establish a home and bring up children" as well as to control their education); *Shurupoff v. Vockroth*, 372 Md. 639, 650 (2003) ("The Supreme Court has long recognized the right of a parent to raise [their] children as a fundamental one protected by the due process clause of the Fourteenth Amendment.").

In Maryland, "parents are the joint natural guardians of their minor child." FL § 5-203 (2014). "The right to rear one's child has been deemed to be 'essential'" and is included within the parents' "basic civil rights." *Wagner v. Wagner*, 109 Md. App. 1, 37 (1996) (first quoting *Meyer*, 262 U.S. at 399, then quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)).

In a custody dispute between two fit parents, the court's focus is on the child's best interests because "each fit parent's constitutional right neutralizes the other parent's constitutional right," thus the parents are viewed as "presumptive equals." *McDermott v. Dougherty*, 385 Md. 320, 353 (2005). Here, by contrast, we have a dispute between a

10

presumed fit parent and a third party.  In this situation, "both parties do not begin on equal footing in respect to rights to 'care, custody, and control' of the children."  *Id.*  A third party "has no fundamental constitutional right to raise the children of others."  *Id.*

### c.  *De Facto* **Parenthood**

Aunt's primary argument is that the court failed to properly analyze whether she was a *de facto* parent under the factors enunciated in *Conover v. Conover*, 450 Md. 51 (2016).  *Conover* describes a *de facto* parent "a party who claims custody . . . based upon the party's relationship, in fact, with a non-biological, non-adopted child."  *Id*. at 62 (citation omitted).  Establishing *de facto* parenthood requires that the third party meet a high bar, "which cannot be achieved without knowing participation by the biological parent."  *Id.* at 74.

After argument and the submission of this case on June 4, 2021, the Court of Appeals decided *E.N. v. T.R*., No. 44, September Term, 2020 (decided: July 12, 2021).  There, the Court held that under the first factor of *Conover*, where there are two legal (biological or adoptive) parents, the prospective *de facto* parent must demonstrate that both parents consented to the express or implied fostering of a parent-like relationship between the prospective *de facto* parent and the child.  Slip op. at 70.[5]

---

[5] Here, there was no consideration of the father's consent, either expressed or implied, as he never answered the complaint and did not participate in any of the proceedings.  As we discuss, because Aunt could not prove Mother's consent to fostering a parent-like relationship between Aunt and K her claim falls regardless.  The holding in *E.N*. should, of course, be followed in all subsequent cases of this kind.

11

Under *Conover*, now augmented by the holding in *E.N.*, the third party bears the burden of proving four factors. First, the third party must prove that the biological or adoptive parents consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child." *Conover,* 450 Md. at 74; *E. N.*, slip op. at 70. Second, the third party must establish "that the petitioner and the child lived together in the same household." *Conover*, 450 Md. at 74. Third, the third party must prove "that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation." *Id.* Finally, the third party must demonstrate "that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature." *Id.*

For the first prong, the consent and fostering by the biological parents "[are] critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child." *Id.* However, this factor also limits the legal parent's rights to "unilaterally sever" a relationship between a third party and the legal parent where the legal parent has invited the third party into the child's life and "that invitation alters a child's life by essentially providing [them] with another parent." *Id.* at 76. If a parent has made a "conscious parenting decision to foster a parent-caliber relationship between a third party and [the] child," then the parent's consent to a prior and intentional parental relationship counterbalances (or supersedes) [their] otherwise preemptive right to determine whether and to what extent another adult is involved in his child's life." *Kpetigo*, 238 Md. App. at 574.

12

## 1. The Motion for Judgment

Aunt asserts that the court "totally changed its mind" in its final ruling compared to the ruling made in response to Mother's oral motion for judgment that was made at the close of Aunt's presentation of the case. Mother argued that Aunt failed to make a *prima facie* showing of *de facto* parenthood. In reviewing a motion for judgment, the "court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Rule 2-519(a) and (b).

At the hearing on the motion for judgment, the court explained that under *Conover*, "the plaintiff has to prove that the defendant consented to and fostered the relationship of the plaintiff with the child in a variety of ways that go beyond that of simply a relationship between an aunt and a child." While the court found that there was no agreement, it highlighted that there appeared to be "implicit consent of the defendant who, according to the plaintiff's testimony, never asked to have the child returned to her." The court concluded that "while there was no explicit oral or written statement, the Court does find that, *at this stage*, and taking the evidence in the light most favorable to the plaintiff, that there has been a demonstration of consent and fostering of the relationship between the child and third party." (Emphasis added.) The court specifically noted that it "found that *at this point*" the first factor of *Conover* had been met. The court's decision was based on the evidence that had been presented in the light most favorable to the Aunt. *See* Rule 2-519.

## 2. *Final Ruling*

In its final ruling, the court concluded that based upon *all* the evidence that had been presented, Aunt did not meet the first prong of *Conover* because Mother did not "consent[] to" or "foster" any type of "formation and establishment of a parent-like relationship" between Aunt and the minor child. Aunt argues that this ruling ignored the evidence presented and lacked any rationale. On review, we are focusing on the court's decision regarding the first factor as that is the main source of contention between the parties. Aunt's argument stems from the fact that at the close of Aunt's case, the court found that the Aunt's evidence established a consensual parent-child relationship and then later, at the close of the evidence, the court found that there was no consensual parent-child relationship.

We review the decision of the circuit court to determine whether the ruling "logically follow[s] from the findings upon which it supposedly rests" or whether it lacks a "reasonable relationship to its announced objective." *North*, 102 Md. App. at 14. Aunt's claims, that the court's final ruling ignored the evidence and lacked a legal basis, are unsupported by the record. The record shows that the court analyzed each of the *Conover* factors and applied the law to the facts in reaching its ultimate conclusion on *de facto* parentage. The court noted that Aunt "satisfied her burden of proof" for the second, third, and fourth prongs of *Conover*. Aunt, however, did not meet the burden of proof for the first prong.

We analyze the trial court's decision regarding the first prong to ascertain whether it was based upon "sound legal principles and . . . factual findings that are not clearly

14

erroneous." *Davis*, 280 Md. at 125-126. The trial court's decision discussed the importance of the first prong and the "knowing participation by the biological parent." Taking the evidence in the light most favorable to Aunt at the end of her case, the court found that she had established a parental relationship with K.

But, when considering all the evidence, the court reached a different conclusion. The court explained that "the establishment of a parent-child relationship between a third party and a child must be voluntary and consensual." The court then cited several facts to support its conclusion that Aunt failed to meet the first prong:

- "In reviewing the evidence, the Court finds that [Mother] contested the original 2017 award of custody and judicial finding of neglect in the Prince George's County Courthouse and in that protective order hearing." Therefore, the court notes that Aunt's custody "was clearly not voluntary or consensual from that through April of 2018."

- "The Court also finds credible that [Mother] attempted several times to have [K] returned to her but with either refusal or no response."

- "Undisputed is the fact that no written document between [Mother] and [Aunt] establishes consent to any legal or physical custody to [Aunt]."

- "Also undisputed is the factual finding that at no time did [Mother] make an oral statement to [Aunt] or anyone else that she was surrendering or encouraging legal or physical custody of [K] to be with [Aunt]. [Aunt] admitted in her deposition testimony of February 28, 2020 as read into evidence at trial that there was quote no agreement with [Mother] about care and custody. End quote."

- "No evidence was presented of any conversation of which [Mother] was a participant as to who should raise [K] or serve as his parent."

- "Mother contested [Aunt's] every effort in this litigation to obtain temporary custody."

15

Taking all of this into consideration, the court explained that "Aunt has not sustained her burden of proof as to the first prong and therefore has not established her status as a *de facto* parent." Since Aunt could not meet her burden of proof, she failed to meet the "'high bar' established by *Conover* to demonstrate [Mother's] voluntary consent or fostering of a parent-child relationship."

Based on our review of the record, the court's conclusion was "founded upon factual findings that [were] not clearly erroneous." *North*, 102 Md. App. at 13. Trial courts have discretion to make findings of fact and apply those facts to the law, and we give the trial court's decision discretion because the trial court has had the opportunity to "weigh the evidence" in a manner, unlike the way an appellate court does. *Burak*, 455 Md. at 617 (quoting *In Re Yve S.*, 373 Md. at 586). Once all of the evidence was presented, the court reviewed the totality of the evidence and found that the evidence demonstrated Mother did not "consent[] to . . . the petitioner's formation and establishment of a parent-like relationship with the child." *Conover*, 450 Md. at 74. Mother also testified as to the numerous instances where she attempted to see K or regain custody and Aunt refused. The court found credible Mother's statement as to her attempts to access and gain custody of K. We conclude that the trial court did not abuse its discretion in finding that Aunt failed to meet the first prong of the *Conover* standard, and thus could not establish *de facto* parenthood. We hold that the court's decision was based on "sound legal principles" and its factual findings were "not clearly erroneous." *Davis*, 280 Md. at 125-26; *Floyd*, 241 Md. App. at 208 (explaining that an abuse of discretion occurs when "no reasonable person would take the view adopted by the trial court").

16

### d. Parental Unfitness

In Aunt's Amended Complaint, she asserted a third-party standing claim based on parental unfitness. Aunt argues that the court abused its discretion in not conclusively determining whether Mother was fit. The court did not abuse its discretion in finding that Mother was fit and further, the record does not support Aunt's claim that the court did not consider Mother's fitness to parent.

Parents have a "fundamental constitutional right to raise [their] child." *McDermott*, Md. 418. The Court of Appeals of Maryland has explained that

> the non-constitutional best interests of the child standard, absent extraordinary (*i.e.*, exceptional) circumstances, does not override a parent's fundamental constitutional right to raise [their] child when the case is between a fit parent, to whom the fundamental right to parent is inherent, and a third party who does not possess such constitutionally-protected parental rights.

*McDermott*, 385 Md. at 418. A presumption exists between a biological parent and a third party that a child's best interests are best served in the custody of the parent. *Id.* at 423 (quoting *Hoffman*, 280 Md. 172, 178-79 (1977)). The burden is on the third party to establish that the parent is either unfit or that exceptional circumstances exist. *Id.* at 424 (citing *Ross v. Pick*, 199 Md. 341, 351 (1952)).

Aunt bore the burden of demonstrating that Mother was unfit. *McDermott*, 385 Md. at 424. Aunt did not plead exceptional circumstances, so we are only focused on whether Aunt met her burden in proving that Mother was unfit and whether the court abused its discretion in finding Mother fit. Aunt presented three reasons as to why Mother was unfit: (1) Mother's mental health; (2) Mother's marijuana/alcohol addiction; and (3) Mother's

17

disciplinary practices. To determine whether the trial court abused its discretion in finding that Mother was fit, we will review each of the three grounds of unfitness asserted by Aunt.

### 1. Mental Health

Aunt contended that Mother was mentally unfit to parent K. The court noted that testimony from Aunt's and Mother's mother, C. O., "identified [Mother's] mood swings and depression" was concerning, but neither party introduced any "professional testimony, assessment, diagnosis, or opinion" as to Mother's mental health. The court explained that while at Fields and Fields, Mother attended therapy twice weekly with "Dr. Barton" and once weekly with "Dr. Sam." The court concluded that Aunt did not present "sufficient evidence from which the Court could find unfitness due to mental health conditions." We do not find this decision to be an abuse of discretion as it is not "well removed from any center mark imagined by the reviewing court" *Brown*, 409 Md. at 601.

### 2. Marijuana and/or Alcohol Addiction

Aunt contended that Mother's addiction to marijuana and alcohol made her unfit. As noted, Mother voluntarily entered the Fields and Fields program, which was designed to help individuals dealing with substance use and addiction. Mother testified that she has not used marijuana since leaving Fields and Fields. While she did initially test positive for marijuana upon arrival to Fields and Fields, she has not tested positive in any of the random drug tests that followed. The last random test was conducted in February 2020. Even though neither party introduced the results of any substance testing, the court noted that it was not "convinced by the evidence that [Mother] is currently using marijuana or alcohol in excess to imbibing or introducing into her body any controlled – other controlled

18

dangerous substance." While the court expressed concern about Mother's lack of current treatment and involvement with "recognized programs such as AA or NA," the court, nonetheless, concluded that "proof of unfitness had not been established regarding substance addiction." This decision is not an abuse of discretion as it is based on "sound legal principles" and the factual findings are not clearly erroneous. *North*, 102 Md. App. at 13.

### 3. Physical Punishment and Neglect

Aunt also contended that Mother was unfit because she had used improper disciplinary measures on K and has a history of neglect. Aunt testified that Mother used corporal punishment on K, locked K in a dark room, and required K to stand with his hands above his head for long periods of time. C. O. testified to seeing Mother administer corporal punishment via hand, but not a belt. Mother completed a parenting class at Fields and Fields. The court noted that no complaints had been made regarding Mother's conduct to Child Protective Services. It also noted that the July 19th domestic violence petition that Aunt filed after the Kings Dominion excursion had been denied for failure of proof. The court concluded that it did not find that evidence of "improper or physical corporal discipline" had been presented that showed Mother was unfit. The court did not abuse its discretion because this was based on the evidence and was not so far "beyond the fringe of what [the] court deems minimally acceptable." *Brown*, 409 Md. at 601.

As for Aunt's contention that Mother failed to adequately care for K and Mother's supposed over-reliance on family members and friends for babysitting services, the court noted that Mother was employed as a waitress/hostess and worked long hours. It noted

19

that Mother had made daycare arrangements for her other child while working. The court explained that "without a doubt, [Mother] has relied upon and called upon family and friends to provide substantial babysitting services, paid and unpaid." Nonetheless, it found that Mother "has made positive strides since the 2017 judicial finding of neglect but does not find that as of the close of trial evidence" there has been a demonstration of a current neglectful condition for the minor child's care by Mother. The court did not abuse its discretion in making this finding as it was supported by the evidence and was not clearly erroneous.

Since the court did not find that Mother was unfit on the grounds of mental health, substance use, or physical discipline or neglect, the court concluded that Mother had a fundamental and constitutional right to raise K. Importantly, the court properly noted that the standard is not whether "a third party could provide a 'better life,' but rather the focus is on the importance of maintaining the family bonds between a child and the parent." *See In re Yve S.*, 373 Md. at 594 ("The fact that [a parent] has a mental or emotional problem and is less than a perfect parent or that the children may be happier with their foster parents is not a legitimate reason to remove them from a natural parent competent to care for them in favor of a stranger." (quoting *In re: Barry E.,* 107 Md. App. at 220)).

We hold that the court did not abuse its discretion in finding Mother fit. The court undertook an extensive analysis of the evidence and concluded that Aunt did not present sufficient evidence to demonstrate that Mother was unfit. *Cf. Floyd*, 241 Md. App. at 208 (explaining an abuse of discretion occurs when "no reasonable person would take the view adopted by the trial court").

20

**II. THE COURT DID NOT ERR IN NOT CONDUCTING A BEST INTEREST ANALYSIS BECAUSE AUNT DID NOT OVERCOME THE PRESUMPTION THAT MOTHER WAS FIT TO PARENT**

### a. Parties' Contentions

Aunt contends that the court erred in not applying the best interest of the child standard as enunciated in *Conover.* Mother contends that Aunt is mistaken in her reliance on *Conover* because Aunt must first establish that she is a *de facto* parent or prove parental unfitness before the court assesses best interests.

### b. Best Interest of the Child Standard

The best interest of the child standard "embraces a strong presumption that the child's best interests are served by maintaining parental rights." *In re Yve S.*, 373 Md. at 571. This presumption stems from the belief that "the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display." *Koshko v. Haining*, 398 Md. 404, 424 (2007). While the best interest of the child standard is of "transcendent importance," this standard "does not ignore the interests of the parents and their importance to the child" as "in almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent." *McDermott*, 385 Md. at 354 (quoting *Boswell v. Boswell*, 352 Md. 204, 220 (1998)).

In Maryland, the "best interest of the child" test is only to be considered where the parents are unfit or exceptional circumstances exist. *McDermott*, 385 Md. at 418. A third-party seeking custody must show "unfitness of the natural parents or that extraordinary

circumstances exist before a trial court could apply the best interests of the child standard."

*Conover*, 450 Md. at 61. A *prima facie* presumption exists that the child's welfare "will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary." *Ross v. Pick*, 199 Md. 341, 351 (1952). The court inquires into the best interests of the child if the parent is deemed unfit or exceptional circumstances exist to the point that staying in the parent's custody is detrimental to the best interest of the child. *Id.* (citing *Hoffman*, 280 Md. at 178.

### c. Analysis

Aunt's argument that the court abused its discretion in failing to consider the best interests of K lacks merit. Aunt's argument that *Conover* mandated the use of the best interest of the child standard is incorrect. *Conover* requires the best interest of the child standard to be used once *de facto* parenthood is established or once the third party establishes that the parent is unfit or exceptional circumstances exist. *Conover*, 450 Md. at 60.

The best interest of the child standard does not apply to the specific facts of this case. In a custody dispute where a third party seeks custody, the third party must establish that the biological parents are unfit or that exceptional circumstances exist. *Conover*, 450 Md. at 60; *McDermott*, 385 Md. at 353 (explaining that parents are asserting fundamental constitutional rights whereas the third party is not asserting a constitutional right); *Koshko v. Haining*, 398 Md. 404, 445 (2007) (finding a grandparent visitation statute

22

unconstitutional where it did not first require the grandparents to establish that the biological parents were unfit or that exceptional circumstances existed).

As discussed, the trial court did not find that Aunt established *de facto* parenthood. For many of the same reasons, the court did not find that Mother was unfit. Specifically, Mother had battled a drug and alcohol addiction, but she had succeeded in overcoming her addictions by seeking appropriate treatment and by the time of the hearing, had remained sober. Similarly, although Mother suffered from depression, she had successfully obtained treatment. And, although Aunt had challenged Mother's parenting style, Aunt had not proven that Mother ever abused or neglected K since the 2017 incident. And, despite these challenges, Mother maintained a presence in K's life and tried her best to care for him. For these reasons, the court found that Aunt could not overcome the presumption that K's welfare "will be best subserved in the care and custody of [Mother]." *Ross*, 199 Md. at 351. Because Aunt could not overcome the presumption that Mother was fit, and did not allege that exceptional circumstances existed, the trial court was not required to apply the best interest of the child standard. *McDermott*, 385 Md. at 418. Therefore, the court did not abuse its discretion in failing to inquire into the best interests of K because Aunt did not overcome the presumption of Mother's fitness nor, as discussed, was Aunt able to establish *de facto* parenthood.


III. **MOTHER'S POST-TRIAL AFFIDAVITS WERE NOT EX PARTE COMMUNICATIONS NOR DID THEY IMPROPERLY INFLUENCE THE TRIAL COURT**

a. **Parties' Contentions**

23

Aunt argues that Mother's post-trial affidavits were *ex parte* communications and improperly tainted the court's decision. Therefore, she contends that the custody orders must be vacated, and the case remanded for a new trial. In response, Mother argues the affidavits were not *ex parte* communications because she mailed copies of them to Aunt and her counsel. Further, the court explicitly stated that the it did not consider the affidavits in rendering its decision.

### b. Analysis

Mother filed two post-trial affidavits where she expressed concern about K's care and safety, and her lack of access to K. These affidavits were filed with completed certificates of service and copies were mailed to Aunt's counsel. Aunt contends that these two affidavits are *ex parte* communications and improperly influenced the trial court.

*Ex parte* communications occur when one party communicates with the decisionmaker without notice to the other party. *Anchor Packing Co. v. Grimshaw*, 115 Md. App. 134, 168 (1996) (citing *Caldwell v. State*, 51 Md. App. 703 (1982)), *vacated on other grounds*. Mother's affidavits are not *ex parte* communication because Mother filed them with certificates of service to Aunt's counsel. Aunt did not dispute this fact. From this we can conclude that Aunt had notice of Mother's affidavits. Consequently, the trial court's exercise of discretion in not striking the affidavits was based on the "sound legal principles" that define *ex parte* communication as those that occur without notice to the other party, which was not the case here. *North*, 102 Md. App. at 13.

Additionally, Aunt did not show how the affidavits improperly influenced the trial court. Indeed, the trial judge explicitly stated in his oral opinion that he had not "considered

24

any of the affidavits that have been filed. I have read them . . . but that had no part in my decision." Without a showing to the contrary, we take the judge at his word that the affidavits were not considered.

IV. **THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING AUNT'S MOTION IN LIMINE TO STRIKE SHANIE YATES' TESTIMONY WHEN AUNT FAILED TO PROPERLY SERVE YATES FOR A DEPOSITION.**

### a. Parties' Contentions

Aunt argues that the court abused its discretion in denying her Motion in *Limine* to prohibit Shanie Yates from testifying. Aunt contends that the court improperly permitted Ms. Yates to testify because she did not appear for her deposition. Aunt contends that the custody orders must be vacated, and the case remanded for a new trial. Mother argues that Ms. Yates was not properly served as required by Maryland rules. Mother also contends that because Ms. Yates was not properly served, Ms. Yates had no obligation to appear at the deposition. Consequently, Mother argues, the court did not abuse its discretion as it had sufficient legal basis for denying the motion.

### b. Maryland Rule 2-510

Maryland Rule 2-510(a)(1)(B) states that a subpoena is required to compel a nonparty to give testimony and produce documents at a deposition. As for service of the subpoena, Rule 2-510(d), in pertinent part, states that "[a] subpoena shall be served by delivering a copy to the person named or to an agent authorized by appointment or by law to receive service for the person named or as permitted by Rule 2-121(a)(3)."[6]

---

[6] Rule 2-121(a)(3) states:

### c. Analysis

Aunt sent the notice of deposition to 6108 Silver Hill Road, District Heights, Maryland. This is the main office for Fields and Fields. The record reveals that Ms. Yates never lived at that address. The trial court explained that "a messenger brought an envelope with a series of subpoenas and deposition notices to an establishment which is not a residence, at least for the people who were attempted to be served." Further, the name on the envelope containing all the deposition notices and subpoenas was Fields and Fields. There was no personal service and most of the witnesses included in the envelope were not residents at that address.

Because Aunt sought to compel Ms. Yates, a nonparty, to attend a deposition, proper service could only be effectuated by serving her personally or serving someone Ms. Yates had appointed to accept service or someone authorized at law to accept the subpoena for Ms. Yates. Under Rule 2-121(a)(3) service could have been accomplished by restricted mail delivery, but that alternative was not tried; personal service was only attempted. Under Rule 2-510(d), Ms. Yates was not personally served. Not only did Ms. Yates not live at the Fields and Fields rehabilitation center, apparently, someone simply dropped off a number of subpoenas for various people at the Fields and Fields staff's office and left.

Service of process may be made within this State or, when authorized by the law of this State, outside of this State by mailing to the person to be served a copy of the summons, complaint, and all other papers filed with it by certified mail requesting: "Restricted Delivery--show to whom, date, address of delivery." Service by certified mail under this Rule is complete upon delivery. Service outside of the State may also be made in the manner prescribed by the court or prescribed by the foreign jurisdiction if reasonably calculated to give actual notice.

26

Consequently, Aunt could not show that Ms. Yates was personally served with a notice of deposition or that alternate service was attempted. Aunt's objection to Ms. Yates testifying based on Ms. Yates supposedly not responding to a deposition subpoena was, in fact, groundless. Based on this record, the trial court did not abuse its discretion in denying Aunt's Motion *in Limine*.

## V. THE COURT DID NOT ERR IN EXCLUDING AUNT FROM THE FINAL HEARING BECAUSE AUNT WAS NO LONGER A PARTY TO PROCEEDINGS

### a. Parties' Contentions

Aunt contends that the court barred her from appearing in her own case at the final hearing, which she claims was an *ex parte* hearing that lacked any legal basis. She also argues that the final hearing was improperly conducted as a CINA proceeding in juvenile court. Finally, she contends that the trial court ignored trial evidence when it awarded Mother full custody. Therefore, the court's orders must be vacated, and a new trial must be ordered.

Mother argues that these issues were not preserved for appellate review and were presented only in the briefs for the first time. Aunt did not object on the record to being excused from the final hearing and made no filings with the court. Even if the issues were preserved, Mother contends that Aunt no longer had a right to be present to the hearing when she had not established parental unfitness or *de facto* parenthood.

### b. Analysis

Maryland Rule 8-131 governs the scope of appellate review, especially as it pertains to issues that are not preserved. "Ordinarily, the appellate court will not decide any other

27

issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8-131(a). "An objection cannot be made for the first time upon appeal." *Tucker v. State*, 237 Md. 422, 425 (1965); *Cohen v. Cohen*, 162 Md. App. 599, 608 (2005).

### i. Aunt's Exclusion from the Final Hearing

Aunt claims that the court excluded her prior to the claims being fully adjudicated, thus denying her procedural and substantive due process rights that exist through the United States Constitution and the Maryland Declaration of Rights. On December 1, 2020, the trial court concluded that Aunt did not establish that she was a *de facto* parent, nor did she establish that Mother was unfit. After the trial court judge explained his decision, he informed Aunt that she was no longer a party to this case, and the following took place:

> THE COURT: By my rulings, [Aunt] is no longer a party to these proceedings. So let's set that date. [Aunt's counsel], you and your client can be excused at this time.
>
> [AUNT'S COUNSEL]: Yes, Your Honor.
>
> \*　　\*　　\*
>
> THE COURT: You don't have to stay here. [Aunt's counsel], you can be excused if you wish. I'm just going to set up a date and arrange for that date with [Mother's counsel] and her client.
>
> [AUNT'S COUNSEL]: Your Honor, with your permission, we'll go ahead and withdraw and obviously review your order when we get it but I'll make sure my client and the child are where they are supposed to be this afternoon.

Aunt did not object to the denial of custody nor did she object to being dismissed from the case. Therefore, we hold this issue was not preserved for our review.

28

Even if the issue was preserved, the court properly excluded Aunt from the subsequent proceedings because she no longer had an interest in the case. The court specifically found that Aunt failed to establish *de facto* parenthood and failed to establish that Mother was unfit. At that point, Aunt was a non-party to the custody proceedings. Such persons have no standing in a custody proceeding since they are not *de facto* parents and have no additional legally cognizable interest in the case. *McDermott*, 385 Md. at 353; *Conover*, 450 Md. at 60.

Additionally, the court did not conduct an *ex parte* hearing on December 21, 2020 once Aunt was no longer a party to the case. A court cannot conduct an *ex parte* hearing if a party has already been dismissed. An *ex parte* communication necessarily entails a communication between a party and the court without the knowledge of an opposing party or their counsel. *See Grimshaw*, 115 Md. App. at 168; *Caldwell*, 51 Md. App. at 703. Here, Aunt was no longer a party when the court conducted its final custody hearing. Therefore, we hold that the court did not abuse its discretion in holding the final hearing without Aunt present because she was no longer a party.

### ii. Final Hearing

Aunt argues that the court erroneously proceeded under CINA and ignored trial evidence of Mother's neglect by only focusing on the DSS report. Aunt identifies no instances where the court ignored the trial evidence to exclusively focus on a DSS report

29

nor does she identify evidence that suggests the court improperly proceeded as a juvenile court.

We note that Aunt presents this issue for the first time in her brief. Consequently, it has not been preserved for review. Md. Rule 8-131(a).

Although Aunt's argument is not preserved, we explain why the court acted appropriately. At the December 1, 2020 hearing, the court noted that it was "referring [K] to the Department of – to DSS whether appropriately Montgomery or Prince George's County for a full investigation as to whether [K] is a Child in Need of Assistance and [the court was also] ordering that DSS assess the risk of neglect by [Mother] of [K]." The trial court stated that it planned to schedule a hearing, if DSS did not file a CINA petition, to determine final custody. The court explained that at the final hearing, it "expect[ed] to hear about living arrangements and daycare and all other aspects of [Mother's] and [K's] life to be updated." The court also explained that at the final hearing it was required to make certain findings as required by FL § 9-101 before awarding permanent custody. The court noted that it was

> mindful of Family Law § 9-101(a)'s requirement that where a previous finding of neglect has been made that a specific finding is required by the court that there is no likelihood of neglect reoccurring before custody can be granted.[7]

---

[7] Maryland Code, Family Law Article § 9-101 states:
(a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.
(b) Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party,

30

Specifically, under FL § 9-101, the court must engage in a two-step process. First, the court must consider whether there are reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding. The preponderance of the evidence standard applies when the court determines whether reasonable grounds exist. *Volodarsky v. Tarachanskaya*, 397 Md. 291, 308 (2007). Second, the court must determine whether it has been demonstrated that there is no likelihood of further abuse or neglect by the party. The court is explicitly prohibited from granting custody or unsupervised visitation to a party who has abused or neglected a child unless the court specifically finds that there is no likelihood of further abuse or neglect. Additionally, "[t]he burden is on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under § 9–101(b)." *In re Yve S.*, 373 Md. at 587.

The record does not suggest, as Aunt contends, that the final custody hearing had been transformed into a CINA proceeding. Instead, the December 1 hearing was held because of Mother's prior finding of neglect as a result of Aunt's 2017 protective order petition that she filed on behalf of K. Under FL § 9-101, the court was required to conduct a hearing to ascertain whether there was any likelihood of future abuse or neglect. The statute states that unless the court "specifically finds that there is no likelihood of further child abuse or neglect by the party, [then] the court shall deny custody." The court did not

except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

31

abuse its discretion in not summarily awarding final custody to Mother, but instead ensuring that Mother was able to care for K.  Under the circumstances, with a prior neglect finding against Mother and Aunt's insistence throughout the custody hearing that Mother had neglected or physically abused K, we cannot say that the trial court's decision to order a follow-up DSS report before it made a final custody determination was so unreasonable that "no reasonable person would take the view adopted by the trial court."  *Floyd*, 241 Md. App. at 208.  The court's factual findings were based on "sound legal principles" and were not clearly erroneous.  Consequently, we hold the court did not abuse its discretion in awarding final custody to Mother.

> **JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1202s20cn.pdf